## Wilson, et al. v. Commonwealth.

(Decided October 20, 1915.)

### Appeal from Christian Circuit Court.

1. Homicide—Self Defense.—Where all the physical facts show upon a trial for homicide there could have been no altercation or struggle and that the decedent was stealthily shot from behind, without notice, the idea of self-defense or manslaughter is precluded, and the court need not instruct upon either.

2. Homicide—Conspiracy.—Circumstantial evidence examined and held to be sufficient to authorize an instruction upon conspiracy.

3. Homicide—Accomplice—Evidence.—Upon the joint trial of two defendants charged with murder it is not necessary to instruct under section 241 of the Criminal Code providing that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence, where a conversation is overheard between the two defendants and their statements to each other testified to by a third party. Such evidence is not the testimony of one accomplice against another, but is only evidence which may be used against either of the defendants.

4. Homicide—Evidence.—Evidence of a conversation between the two defendants wherein one of them charged the other with having fired the shot, which charge was neither affirmed nor denied, is competent where it appears that the whole conversation was overheard and stated by the witness.

5. Homicide—Threats—Evidence.—Threats by a defendant, while in custody, made after the commission of the offense with which he was charged, against third parties, which have no connection with the crime charged, and are not made for the purpose of suppressing evidence of that crime, are not competent evidence against him.

JOHN C. DUFFY and TOM G. SKINNER for appellants.

JAMES GARNETT, Attorney General, CHARLES H. MORRIS, Assistant Attorney General, ROBERT T. CALDWELL and W. T. FOWLER for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

Appellants Ernest Wilson and Bubber Chafin were jointly indicted charged with the murder of J. M. Renshaw as the result of a conspiracy alleged to have been entered into by them, the indictment charging that one of them did the shooting from which Renshaw died and that the other was present at the time aiding and abetting therein, but that which did the shooting was unknown to the grand jury.

Upon their joint trial they were each convicted and sentenced to the penitentiary for life, and they jointly prosecute this appeal.

Renshaw lived a few miles south of Hopkinsville on the Clarksville pike, and a short distance north of his home and in sight thereof was a bridge crossing Little River, over which he had to pass in going to Hopkinsville. On the afternoon of September 25th, 1914, about 3:15 o'clock, he left his home alone in his buggy and started towards Hopkinsville; about the time he reached the bridge, or was just past it, a shot was heard in the vicinity; a short distance beyond the bridge he was met by persons in two or more vehicles, was bent over in his buggy, had dropped the lines, and seemed to be either sick or drunk, although his horse continued to trot slowly along; a short distance further on his son, who was going home from Hopkinsville, met him, and seeing his condition stopped the horse, took him back home, immediately sent for a physician, when it was discovered that he had been shot in the back of the head about one and one-half inches back of the right ear. He never regained consciousness and died in about two weeks. A short distance north of the bridge is a depression in the road where it is concealed from sight by trees or hedge, and it is at this point where the shot is supposed to have been fired. Renshaw at the time had about twenty dollars in money upon his person, which had not been disturbed when his son met him.

The appellants are shown by the evidence to have been very intimate friends and companions; early that morning one of them went to the home of the other and called him out; they were later seen together on a railroad track some three-quarters of a mile distant from the scene of the killing, at which time Chafin was approached and asked to refund some money which he had promised to pay that day; he said he did not have the money but,

in the presence of Wilson, said to the witness that he would have some money before night if he had to kill some son-of-a-bitch. Within one hour before the shooting, probably within thirty minutes, Chafin was seen near the bridge going in that direction with a woman named Mattie Taylor with whom he is shown to have been intimate; about the same time Wilson was seen approaching the bridge and near it. Within a very short time before the shot was fired two negro men were seen near the south abutment of the bridge, and a negro woman of the general description of Mattie Taylor was seen leaving there; shortly after the shooting two negro men were seen about 100 yards below the bridge as they dodged into the hedge along the river. Immediately after the shooting two men were seen to emerge from the south entrance of the bridge; there had been a shower that day and the ground was soft, and early the next morning it could be seen where they climbed over the fence near the south abutment, their tracks followed down the river to a shallow place where they crossed, and thence proceeded, as shown by their tracks, remaining together all the time, until they got several hundred yards away, when one of them left the other and proceeded toward the house, as shown by his tracks, of a negro woman in the neighborhood named Leavell. His tracks were then traced back to the point where he had left his companion and thence they proceeded together until they reached the railroad track of the Tennessee Central Railroad. Later that afternoon two negroes were seen a few miles away proceeding hastily along the railroad track.

The south abutment of the bridge is in sight of the house of Renshaw and he could be seen from there as he drove out of his place toward the pike. The top of the buggy in which Renshaw was riding was partially down, and the shot which killed him first passed through the top of the buggy and struck him in the head, ranging up, the top of the buggy being powder burnt as well as the back of Renshaw's neck.

It is the theory of the Commonwealth that these two negroes being in desperate need of money had entered into a conspiracy to murder and rob anyone that might happen along at this bridge at a favorable time, and that after they had shot Renshaw they were deterred from carrying out their purpose of robbery by the unexpected appearance of other persons along the highway. The

tracks made by the two persons were so far apart as to indicate that they were running at the time, and the tracks made by one of them showed that he had a cleat on at least one of his shoes such as is placed on baseball shoes, and it is shown by the evidence that two or three days after the killing Wilson was wearing a pair of baseball shoes. On the Tuesday following the killing on Friday, Wilson was informed by his employer Fowler that the tracks showed that one of the men who had run away from the bridge had a cleat on one of his shoes such as are placed on baseball shoes, and Fowler testifies that Wilson at the time had on a pair of old baseball shoes which seemed to be too small for him and which were split. After the arrest of Wilson he told the deputy sheriff that he had some clothes at the home of Eva Chafin, a relative of Bubber Chafin, and when the deputy sheriff went to the home of Eva Chafin he found among other things one baseball shoe which had been split; he could not find the other shoe but directed the woman to hunt it up, and upon going back the following day found a baseball shoe on the fire partially destroyed.

In addition to this circumstantial evidence there is evidence by a negro man that Bubber Chafin told him in November at Nortonsville before his arrest, that he had shot a white man at Hopkinsville and was on his road to St. Louis. A negro woman testifies that some time after the killing Chafin undertook to pay her some attention, or "to go with her" as she says, and she declined to permit him to do so whereupon he told her that if she did not go with him that she would never do anybody else any good, that he had shot and killed Mr. Renshaw, and inferentially threatened to kill her.

Doc Beaumont, colored, was an inmate of the jail at the same time Wilson and Chafin were, and testifies to a conversation between them overheard by him, but which they did not know he heard. His statement is as follows:

"Bubber says to Ernest, 'Have you got you a lawyer?' and Ernest told him no, he didn't need no lawyer, and Bubber said, 'You ought to get you one,' and he said, 'I don't need no lawyer,' and Ernest said, 'You know you are the one that fired the shot,' and I never said nothing myself, because I wasn't concerned in it myself, and that is all I heard."

The witnesses who saw the two negro men at the bridge just a short time before the shooting did not know

either of the appellants, and having paid no particular attention to them did not identify either one of them; but the witness who saw Chafin in company with the woman going toward the bridge knew him well and positively identifies him, and the witness who saw Wilson about the same time going toward the bridge and near it knew him also and positively identifies him. Each of the defendants denied being at the bridge on that day or having anything to do with the shooting of Renshaw; and they each relied upon an alibi which they undertook separately to establish. Several witnesses testified for Chafin that during that day at different times he was at work in his father's tobacco field, and some of them said that he was there at about the time the crime was committed; on the contrary the Commonwealth in rebuttal introduced at least three witnesses who denied that Chafin was in the field at that time.

For Wilson, in addition to his own statement, two witnesses were introduced who stated that at the time of the shooting he was at the house of Roy Carter; but this statement is denied by Carter and his family, some of whom stated that he was not there during that day.

Five reasons are urged as grounds for reversal: (1) That the trial court erred in failing to instruct on the law of manslaughter and self-defense, and (2) that it erred in giving an instruction on conspiracy, (3) that it erred in failing to give an instruction conforming to the provisions of Section 241 of the Criminal Code, (4) that it erred in admitting incompetent evidence against the defendants, and (5) that it erred in permitting improper argument to the jury by the attorneys representing the Commonwealth.

The contention that there should have been an instruction upon manslaughter and self-defense is based upon the rule many times declared by this court that when there is no eye-witness to a homicide and no one who saw the parties after they met on the occasion of the killing, the law covering murder, self-defense, and manslaughter should all be given to the jury in the instructions in order to meet any state of fact which the jury might find from the circumstances in evidence to have existed. And that is unquestionably the rule when there is evidence either direct or circumstantial from which the jury might infer that an altercation had taken place between the parties.

But where all the evidence and all the physical facts show that there could have been no altercation or struggle, and that the decedent was stealthily shot from behind without notice, as in this case, the idea of self-defense or manslaughter is positively precluded. In this case the uncontradicted evidence is that Renshaw a few short moments before the shot was fired was driving peacefully along the highway; that at the bridge which he had to cross there were two men; that when he was a short distance beyond the bridge a shot was fired from the rear through the top of his buggy into the back of his head; that two or three minutes thereafter he was seen in his buggy, but stooped over and resting upon the buggy with the lines lying loose. It would be difficult to imagine under this evidence how an altercation could have taken place between Renshaw and the person or persons who killed him.

In the case of Bast v. Commonwealth, 124 Ky., 747, all the authorities in this State were reviewed on this question, and the court, after an exhaustive investigation and analysis of all the cases, laid down the rule in this way:

"This court has held with a degree of uniformity that it is the duty of the trial court to give to the jury all the law of the case, as warranted by the facts and circumstances proven; and in those cases in which the physical facts show that the homicide could not have occurred in any particular way, then it is not the duty of the trial court to give to the jury the law on that phase of the case. Where the physical facts are such as to preclude the idea that there was a struggle or any resistance offered, whatever, by the deceased, at the time that his life was taken, the trial court would be fully justified and warranted in refusing to give an instruction on self-defense. And, again, where the physical facts, as in the case before us, are such as to preclude the idea or the possibility that the killing was the result of an accident, or that it was the result of a sudden affray, then the trial court would be warranted in refusing to give an instruction on the subjects of voluntary or involuntary manslaughter."

The rule laid down in that case is just as applicable to the facts in evidence here as it was there.

The second contention is that the instruction on conspiracy should not have been given for the reason that there was no evidence of a conspiracy. While it may be admitted that there was no direct evidence of a conspir-

acy, an analysis of the evidence already stated shows such facts and circumstances as authorized the jury to infer that there was a conspiracy. The fact that they were chums and were together most every day; that one of them went to the home of the other on that morning and by signal called him out; that they left there together and some time later when money was demanded from one of them, which he did not have, he stated in the presence of the other that he would have some money before night or kill some son-of-a-bitch; that they were seen that afternoon a short time before the shooting, each approaching the bridge; that shortly thereafter a shot was fired and two men were seen immediately running across the bridge and emerging from its southern entrance; that in two or three minutes thereafter two men answering to their general description were seen a short distance down the river from the bridge, and upon being discovered dodged into the bushes; the fact that the tracks of one of those men showed that the shoe he wore had a cleat on it, and that a day or two later one of them had on a pair of baseball shoes which had been slit down in front, and that one shoe answering this description was some time later found by an officer at a place where Wilson said he had some clothes; the fact that one of the defendants immediately after the killing disappeared from the vicinity of Hopkinsville, and that the other remained thereabouts but was hidden in the day time; the fact that shortly thereafter one of the defendants stated to a witness that he had shot a white man at Hopkinsville and was going to St. Louis; the fact that the same defendant stated to another witness that he had killed Mr. Renshaw; and the further fact that one of the defendants said to the other after they were in jail, "that you know you are the one that fired the shot," when all taken together, and put together, form a chain of circumstances which authorized the jury to believe that there had been a prearranged plan between them to commit this or some other crime of a similar nature for the purpose of obtaining money.

The facts and circumstances in evidence in this case, when they are analyzed and their relation to each other is understood, form a much stronger case of conspiracy than that which was shown in the case of Shelby v. Commonwealth, 91 Ky., 563, wherein the court said the evidence of conspiracy was insufficient to authorize the instruction. In that case, as stated by the court, the only

eviaence of conspiracy was the fact of the relationship of father and son existing between the two defendants; it was not shown there that either of them had threatened to commit murder for the purpose of obtaining money; it was not shown that they subsequently met at a convenient place for the carrying out of such a scheme; it was not shown that they left the place of the crime together and ran away; it was not shown that either one of them charged the other with the actual commission of the crime.

After a careful examination and analysis of all the evidence in this case we have reached the conclusion that all the circumstances, when considered in their relation to each other, justified the giving of the instruction on conspiracy and authorized the jury to find that such a conspiracy existed.

Section 241 of the Civil Code provides:

"A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof."

Under this section it is insisted for the appellants that the court should have given an instruction limiting the weight to be given to the evidence of Beaumont about the conversation overheard by him between the defendants; but clearly this Code provision has no application to evidence of a conversation heard between two defendants which is given by a third party, but applies only when the testimony of an accomplice is given in open court; the statement by one defendant to another which is overheard and thereafter testified to by a third party is not the testimony of one accomplice against another. It is only evidence which may be used against either or both of them.

It may be admitted that the statement of Chafin subsequent to the commission of the crime when Wilson was not present and did not assent to it was not competent evidence against Wilson. But neither in his statement to the witness at Nortonsville, that he had shot a white man at Hopkinsville and was going to St. Louis, nor in his statement to the woman at Hopkinsville that he had killed Renshaw, did Chafin in any way or manner implicate or connect Wilson with the commission of the crime,

and consequently this evidence could not have in any event affected Wilson or been prejudicial to him.

It is the further contention that the evidence of Beaumont that he heard Wilson say to Chafin while they were confined in jail, ''You know you are the one that fired the shot,'' was incompetent as against Chafin for two reasons: (1) Because it is not shown by the evidence that he either adopted or assented to the statement of Wilson, and (2) because under the circumstances he was not called upon to either deny or assent to it.

It is true that the evidence of Beaumont does not, in terms, show that Chafin either denied or assented to this statement of Wilson, but considering all of Beaumont's testimony it is fairly apparent that he overheard the whole conversation between the parties and gave the substance of it all.

On the second proposition the appellants rely upon the case of Merriweather v. Commonwealth, 118 Ky., 870. In that case eight persons were in custody of the officers, charged with murder, in a waiting room at a depot; they were manacled and being hurried to jail; there was great indignation in the community over the crime; surrounding the accused was a large and excited crowd, and none of the defendants had had an opportunity to consult their counsel or to receive any advice from their friends. Under these circumstances some of the accused made statements involving the guilt of Merriweather, and he never denied, confessed or assented to such statements, but remained silent, and the court held that under those circumstances he was not bound to speak and that the evidence was not competent as against him on his separate trial. In the case of Hayden v. Commonwealth, 140 Ky., 634, the court followed the ruling in the Merriweather case, the facts in the Hayden case being that a man and woman were charged with grand larceny and evidence was admitted against the man upon his separate trial to the effect that the woman had stated to the officers, in his presence, that she had thrown the things out of the window to him and that he had taken them and that he did not deny it, and it was held that such evidence on his separate trial was not admissible as against him.

But the difference between the situation of the parties in those cases and this calls for a different application of the rule; in this case the two defendants had been in jail for some time, were not immediately in custody of the

officers, were not at the time surrounded by an excited crowd, but were quietly discussing their own case as they supposed in absolute privacy. Nothing could have been more natural than for Chafin to have immediately denied, if it had not been true, the accusation of Wilson that he (Chafin) had fired the shot that killed Renshaw. They were two ignorant negroes, each charged with a crime, one with having committed a murder and the other with having been his confederate, and in their ignorance it was perfectly natural for them to believe that the one who actually fired the shot was more guilty than the other. It cannot be doubted that when this conversation was had Chafin, under the circumstances, would have immediately denied it if it had not been true. If our assumption that Beaumont overheard the whole conversation and undertook to give the substance of it all, is correct, this evidence was competent against each of them. On another trial doubtless this point will be made clearer.

While appellants were confined in jail Chafin wrote a letter to his mother which was intercepted by the jail authorities and was introduced as evidence by the Commonwealth over the objection of the appellants. In this letter he earnestly protested his innocence of the charge, but expressed doubt of his acquittal because of perjured testimony which he expected to be used against him, and said to his mother in addition that if she and his father did not come down there soon and aid him, he would kill the jailer or the jailer would kill him, as he had made up his mind to die, if necessary, to free himself.

The letter when analyzed contains nothing but his declaration of innocence and his purpose to kill the jailer, if necessary, to get out of jail. It is apparent that the Commonwealth did not want to introduce the letter because it contained this claim of innocence; it could only have desired its introduction for the purpose of showing the threat against the jailer.

Threats by a defendant being tried for homicide made against persons other than deceased are not competent even though they are made before the commission of the crime (Word v. Commonwealth, 151 Ky., 527); and there is much better reason to exclude threats made by the defendant after the commission of the offense with which he was charged, unless the threat has some connection with the crime charged or is made with the purpose of suppressing evidence of that crime. In this case

the defendants were on trial charged with killing a man and the Commonwealth was undertaking to show their guilt only by circumstantial evidence; no statement in the letter elucidated any issue in the case nor shed any light upon any disputed fact; so far as we can see it could have been used for no other purpose except to inflame the minds of the jury against a defendant who could be guilty of such a threat.

The introduction of this letter was clearly error and plainly prejudicial to both appellants; for in no event could it have been competent against Wilson.

The fact that one of the attorneys for the Commonwealth in his argument referring to this letter said that it showed Chafin to be a murderer in his heart and fully capable of killing Renshaw, not only demonstrates the purpose for which the letter was introduced but emphasizes the necessity of excluding it.

For the reason given, the judgment is reversed, with directions to grant each of the appellants a new trial and for further proceedings consistent herewith.