## Jones v. Commonwealth.

(Decided Oct. 30, 1936)

466

ARTHUR RHORER for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and defendant below, Tom Jones, was indicted on November 4, 1935, by the Bell county grand jury wherein he was accused of murdering his wife, Flossie Jones, by shooting her with a pistol. At his trial on November 15, 1935 (eleven days after the return of the indictment), he was convicted and punished with death. His motion for a new trial was overruled, and he prosecutes this appeal seeking a reversal upon four grounds as classified in brief of his counsel, but other points are argued in brief which are not embraced in either of the four classifications. We will first dispose of those four grounds and then briefly notice such of the other argued points as we conclude deserve mentioning. The classified grounds, as made by counsel, are: (1) Overruling by the court of defend-

ant's motion to postpone the trial, to a later day and transfer the prosecution to be tried in the city. of Middlesboro, Ky., instead of Pineville, the county seat of Bell county; (2) improper admission of the, testimony for the commonwealth of the infant witness, Mary Lee Martin; (3) that the verdict is not supported by the evidence; and (4) misconduct of commonwealth's attorney and the court, which counsel insists was prejudicial to his client's rights. They will be considered and·determined in the order named.

■ The killing, with the commission of which defendant was charged, occurred on October 30, 1935, between 1:30 and 2:30 o'clock p. m. The place was either in the middle room or rear kitchen room of the residence of Frank Martin and wife, Lizzie Martin. On the day the indictment was returned defendant was brought into court and the trial was set for November 12, 1935, and on that day it was again set forward to November 15th, at which time it was entered into. On the day of the setting for trial defendant was notified to take out process for his witnesses and to otherwise prepare for trial; but on the day it was called defendant's counsel filed the affidavits of himself and client asking a postponement thereof, and in which it was stated that defendant had not employed an attorney until November 8, four days after the order setting the case for trial. The grounds for the motion were that "he [defendant] has been unable to acquaint his attorney with the true facts of the case and that he has not been able to summon his witnesses to appear in his behalf on November 12th, the date set for his trial, and that he cannot be given a fair and impartial trial and have the benefit of his witnesses on said date of trial," but that all such reasons could be and would be removed by postponing the date of the trial. Nothing was attempted to be shown in either of the affidavits as to why defendant was "unable to acquaint his attorney with the true facts of his trial," or "that he had not been able to summon his witnesses to appear in his behalf on November 12th," the day for which the trial was set. The name of *no* witness was mentioned in either affidavit, nor was there a statement of *any* fact that *any* absent witness would testify to.

Defendant lived with his parents ·a short distance over in the state of Tennessee from Middlesboro, but he was employed in a garage located either in or in the

suburbs of that city and spent most of his time there. No showing was attempted to be made that he or his attorney, who resided in the same city, was not acquainted with material witness, nor unacquainted with facts to which they would testify. No case is cited wherein such an imperfect manifestation or contention was upheld. To do so would make it possible for every violator of the criminal laws to escape a trial without any showing whatever that his rights would be any better protected by a continuance or postponement. Such an approved practice would not only clog the dockets of the courts having jurisdiction to try prosecutions, but it would also work manifest injustice to the commonwealth and to society resulting from failure to try violators of the law with reasonable dispatch consistent with justice to both them and the commonwealth. An unduly long list of domestic cases could be cited wherein such imperfect grounds were not allowed to work a postponement, but the proposition is so universally approved that we deem it unnecessary to encumber the opinion therewith.

■ The infant witness, Mary Lee Martin, whose testimony is the basis of ground (2), was just past six years of age at the time of the killing and when she testified, sixteen days thereafter. She had a lisp in her speech which interfered slightly with strictly accurate and distinct pronunciation; but her phonetic language in giving her testimony clearly and unmistakably indicated that she knew what she was testifying about and understandingly comprehended the facts about which she was inquired. It is not even claimed that such obstruction of speech was due to any mental inferiority, and what objection is made thereto is utterly without foundation. So that the only question left concerning this ground is whether or not she was incompetent solely because of her age. A moderately late case in which the question was considered and determined is that of Meade v. Commonwealth, 214 Ky. 88, 282 S. W. 781, 783. It was therein declared that: "There is no unalterable rule measuring the competency of a witness because of his or her age, and that the true test is: Whether the witness possesses sufficient intelligence to truthfully narrate the facts to which his attention is directed and about which he mav be inquired." The case of Leahman v. Broughton, 196 Ky. 146, 244 S. W. 403, wherein the same rule was announced, was referred to

in the Meade opinion and this excerpt was taken therefrom: "Regardless of its age, if it [infant] is shown to possess sufficient intelligence and sense of obligation to tell the truth, although it is unable to explain or even comprehend the mysteries of the future life," competency is established. See also, to the same effect, the case of Merchant v. Commonwealth, 140 Ky. 12, 130 S. W. 793, and White v. Commonwealth, 96 Ky. 180, 28 S. W. 340, 16 Ky. Law Rep. 421.

Mary Lee Martin in this case was shown to possess superior intelligence for her age and connectedly narrated her testimony, which was not materially shaken upon cross-examination. But in this connection counsel seriously complains of this occurrence: When the infant witness was offered the court had the jury to retire for a voir dire examination. It was sufficient to satisfy the court of her competency; but counsel insisted then and there on asking her the persons with whom she had conversed since the commission of the homicide. The court informed him that such an inquiry was not relevant on such an examination, but that he would be extended all liberties of inquiry in that direction upon cross-examination of the witness before the jury, which he did at that time. To that ruling of the court, though in the absence of the jury, a loud complaint is made; but we are unable to agree therewith, since we conclude that the court properly ruled with reference thereto.

■ The disposition of ground (3) calls for a statement of the material facts as developed by the commonwealth's testimony. The record does not disclose the age of either husband or wife, though it does appear that both had considerably passed the line converting an infant into an adult. They had spent a comparatively short married life residing with defendant's parents a short distance into the state of Tennessee from the Kentucky line. They had a child between two and three years of age, and some two and a half months before the fatal day the wife left that household and took up her abode in the residence of Frank Martin and wife in Middlesboro, Ky., where she remained until she was killed. What duties, if any, she was performing in that house are not manifested, but defendant stated that during that time he had visited his wife "1,000 times," which made more than sixteen visits per day. Of course, he was mistaken in that statement, but he *was*

a frequent caller at that house and on some occasions remained there with his wife for as long as a week.

On the morning of the fatal day, defendant drove a secondhand Chevrolet sedan to the home occupied by his wife and stopped it in an alley by the residence. His wife went out to meet him and got up in the seat of the automobile. A witness for the prosecution proved that he was abusing her and cursing her, as well as administering some slaps or licks on her face, and that she was crying. She got out of the automobile and took with her the crank with which it could be started, although it was equipped with a self-starting apparatus. When she returned to the house the two Martins (Frank and wife) testified that she was still crying and that she showed bruises or other evidences on her face unerringly indicating that she had been struck thereon. They also testified that when she left the house to meet her husband at that point she was in a good humor and gay. Defendant left, and at about 1:00 p. m. he returned riding in the same motor vehicle and brought along with him Herman Chadwell. The two Martins were then there, and some talk was engaged in relating to the trading of the automobile by defendant to the Martins, and Mr. Martin agreed to then try out the machine, and he and the rest of them insisted on Chadwell going along. When the three left, there remained in the house only defendant and the deceased. A short while thereafter he went to a hardware store, carrying with him a pistol belonging to Frank Martin, and which was in the house at the time, and while there he bought six cartridges with which the weapon was loaded by the merchant who sold them, when defendant took the pistol and went away. The store in which that purchase was made was some two or three blocks from the scene of the homicide, and in about fifteen or twenty minutes a report came to the merchant that Mrs. Jones had been killed in the home of Frank Martin.

Mary Lee Martin, the infant witness, was a sister of Frank Martin, and it seems that she and her mother were at least temporarily abiding in a residence across an alley which was owned and occupied by Mary Ball. Mary Lee says that she was in the house with the deceased at the time defendant returned in the afternoon from purchasing the cartridges, and that she informed deceased of his approach and deceased remarked: "He won't hurt me." But instead he approached his wife

with the remark: "I will kill you, God Damn you." As expressed by the witness: "I till you Dod 'damn you." Whereupon she attempted to run into the kitchen, but he overtook and shot her; that he then left the house from the back way running through an alley, with the pistol in his pocket. He was captured some twenty minutes thereafter as much as or more than half a mile from the scene of the tragedy. The pistol had one empty chamber, three snapped cartridges, and one loaded and unsnapped one, the trigger resting on the empty chamber of the cylinder. Deceased was shot some two and a half or three inches below her left armpit and about two inches towards the spinal column. The infant witness testified that as deceased ran away defendant threw a shoe at her (witness), and the first person to her found her lying upon her face with her left shoe removed and the top of the stocking rolled down to about her ankle. One of the first witnesses to her testified that she was alive and made some accusing remark against defendant and soon expired after being turned over by that witness.

The infant witness said that she ran across the alley to enter the residence of Mrs. Ball, where her mother was, and that she attempted to do so by way of a side porch facing that alley, and at a place where she could see into the room where the tragedy occurred. She became slightly confused as to her exact whereabouts when some of the facts to which she testified occurred, i. e., as to whether she was in the Martin residence at the time or on the side porch of the Ball residence from which she could see into the Martin premises, but such confusion was the only approach to a contradiction of her testimony. Virginia Shumate resided across the street from the mouth of the alley separating the Ball residence from the Martin residence. She testified that she was standing at a window in the second story of her residence when defendant made his morning visit to the Martin residence and saw the quarrel as well as the fight that occurred out there, as we have hereinbefore stated. She said that: "He [defendant] slapped her and she throwed her hand to keep from getting another lick, and he picked up the car crank to hit her with. * * * He started to hit her with the crank and she got out of the car and grabbed the crank and started toward the house" (meaning Martin's residence), when defendant drove away; that he made a

number of trips around the block passing each time by the Martin residence. She testified that in the afternoon upon defendant's second trip she was again at the same place, when she saw the deceased trying to take a pistol away from defendant and urging him to come back and not to go downtown, but he declined and went away, and which was evidently the trip he made to the hardware store to purchase cartridges. The witness says that in a short time he returned and went into the Martin house, when she almost immediately heard the firing of the pistol and saw defendant depart in the manner hereinbefore described. Witness immediately went to the scene and discovered and recited in detail what we have already related with reference to the location of the body of the deceased and its adjustment. No powder burns were found, or were made, either on the dress of the deceased or on her body. Defendant was more than six feet tall, while his wife was much lower. The ball that penetrated her body lodged just under the skin after passing through her body going in a straight direction.

Defendant stated that after he left the Martin residence in the forenoon he continued to drive around about over town with no definite object in view, and that the reason why he returned to it in the afternoon was for the purpose of getting the crank to his automobile which his wife had taken out of it in the forenoon, but, as stated, it was equipped with a self-starter and there would apparently be no use for the crank. There is a strong indication that the trip of the Martins in the car with Chadwell along—leaving defendant and deceased alone—was encouraged by defendant, the purpose of which might have been a guilty one, since he knew of the presence of the Martin pistol in the residence because he had seen it on the occasion of his forenoon trip to the house. There are other more or less guilty circumstances and testimony in the case which we deem unnecessary to relate, but all of which most clearly manifest the fallacy of counsel's argument that the testimony was insufficient to sustain the conviction.

He testified in substance that after the Martins and Chadwell had left the residence upon his afternoon trip thereto, he and his wife were talking about their domestic affairs, and that she procured the Martin pistol, which was then unloaded, and requested him to go to a hardware store and procure some cartridges for it,

which he did with 25 cents that she furnished; that when he returned with the loaded pistol she took it and put it under the pillow from whence she had taken it, and that at a time when they were quarreling she went out of the room and procured the loaded pistol from the place she had deposited it and returned with it in the room where he was located with a threat to kill him; that she then had the pistol in her left hand pointed at him, when he grabbed it; that a scuffle then followed, during which it was caused to fire and which produced the death of his wife, as hereinbefore described; that he never had his hands on the handle or the trigger of the pistol; and that after the shooting he was suddenly seized with a notion to depart in a run from the residence, carrying with him the weapon with which his wife was killed.

His testimony was all that was given in the case touching the immediate occurrences to establish his innocence, and it must be admitted that when tested by the rules of human experience it appears, to say the least of it, hazy and more or less incredible, as well as in some respects almost if not entirely impossible. We make the latter statement because of the fact that with the pistol being held by the deceased in her left hand as described by defendant, it would have been almost impossible for its muzzle to have been turned towards the body of deceased and fired so as to have described the line traveled by the bullet through her body. Also that if it had been so fired there would have been—almost inevitably—evidences of powder burns at the point of entrance, either on her clothing or on her body. Moreover, defendant claimed to have been madly in love with his wife, and if her death had been produced in the manner he described, the last course that human experience in such circumstances would have dictated would be to leave her alone bleeding and prostrate when she had not yet completely expired. However, he pursued a course directly contrary thereto and one that the guilty usually adopt, i. e., flee from the scene of the crime. Not only so, but it did not occur to him to leave the weapon where it fell with the body of his wounded wife upon the floor, but chose the opposite course of taking it along with him for no other imaginable purpose than defense. Such is the case in general outline presented by both the prosecution and the defense.

Other testimony on collateral issues was intro-

duced, some of which was the impeachment by a witness of the witness, Shumate, and possibly another witness of the prosecution; but that testimony went exclusively to their credibility and made a question for the determination of the jury, and their determination of it is supported by what we conclude is the overwhelming weight of the entire testimony heard at the trial, a part of which was that given by J. E. Yoakum, to which we have not heretofore referred. He testifies that shortly after (as is manifested) the departure of the Martins in the afternoon on their testing trip of the automobile, he visited the Martin residence and saw defendant and his wife in one of the rooms. He delivered milk to the Martins and went there to get some empty bottles, and while there deceased not only delivered to him the empty bottles, but likewise gave him at his request a drink of liquor; that while there "he [defendant] asked her for some cartridges or some money to get some cartridges and she said 'you don't need no cartridges. Take that pistol and put it back under the pillow where it belongs.'" Witness soon left with his empty milk bottles and visited a few other places in the neighborhood on similar missions, and in about thirty minutes after he had left the Martin residence he heard of the homicide. During that thirty minutes defendant evidently made the trip to the hardware store to procure the cartridges as hereinbefore related. We are constrained to conclude that this ground, in the light of the testimony as we have narrated it, cannot be sustained.

■ The misconduct of the commonwealth's attorney forming a part of the basis for ground (4) was a statement made by that officer at the beginning of his argument to the jury, in which he said: "Gentlemen, I have never in all my life heard such an abusive speech as I have just listened to from Mr. Rhorer. He has gone outside of the record, outside of the evidence, outside of the case, and I want to say to you, Mr. Rhorer, that both as a lawyer and as a man, you have lowered yourself in my estimation, and I feel * * *." The argument of defendant's counsel to which the prosecuting attorney referred in that statement is not made a part of the record, but it is otherwise shown that counsel went far afield in presenting his client's cause by not only discussing matters not testified to, but in the denunciation of the witnesses for the commonwealth. Im-

mediately upon the close of the inserted remarks, defendant's counsel arose out of his seat and objected, when the court directed him to take his seat, which he declined to do, and after repeated requests by the court for him to do so, the court had the sheriff to retire the jury and then entered a fine of $5 against counsel for contempt of court. The jury was then returned and the argument of the prosecuting counsel proceeded, there being no other reference to the matter. The imposing of the fine on counsel is the misconduct forming the remaining part of ground (4), i. e. misconduct of the court. We have been cited to no case in support of this ground. Perhaps prosecuting counsel in criticizing the argument of his opponent may have gone farther than strict propriety demanded, but surely that slight departure could not and did not prejudice defendant's cause before a jury who had heard both of the counsel and were thereby made familiar with the motive that prompted the commonwealth's attorney in making his complained of remarks. Surely, the action of the court in inflicting the fine on defendant's counsel, which was done in the absence of the jury, in the circumstances, cannot be regarded as an error, much less a prejudicial one.

Some of the points, to which reference has been made that are argued by counsel, and which are not embraced in any of the four grounds that we have discussed, are: (a) The refusal of the court to permit defendant to introduce competent evidence offered by him, (b) that at the time of entering into the trial there was not a full panel of the jury available for service, and (c) that one of the jurors slept during the trial. But little need be said with reference to either of them. With reference to point (a), but one avowal was made throughout the record as to what any witness would say if permitted to answer the question to which the court had sustained the commonwealth's objection. That avowal was as to what defendant said to the officers after he was arrested and had been put in jail. The court sustained an objection to that on the ground that if the answer was a favorable one to defendant's cause it would be a self-serving one and which was eminently correct. The avowed answer was: "You [the officers] don't know the trouble I was in. After that gun fired I would have ended it all, I would have put a bullet in my heart. I snapped the gun three times, look in the

gun and you will see." Defendant had already testified to all of that while on the stand, and thus got the benefit of it; but if he had not so testified, surely it cannot successfully be contended that he could make testimony for himself in any such manner. We therefore conclude that the only avowal made contained no competent evidence in behalf of defendant. Besides the absence of avowals, the great majority of the facts sought to be elicited by the questions to which objection was sustained by the court were later related by the same witness without objections on the part of the commonwealth—prominent illustrations of which are found on pages 52-53, and on pages 63-64, of the transcript of the evidence.

Defendant was asked this question: "Since she has resided there [at the Martins] have you attempted to have her return to your home and baby?" Objection was sustained to that question, but no avowal made. He was then asked whether he had seen his wife during the time she resided at the Martin residence, to which he gave an affirmative answer. He was then asked to state "whether or not you have attempted to have her return to her home." To which he answered: "Yes sir, I did, I ask her every time I saw her to come back home." Again he was asked if his wife had communicated to him a venereal disease, to which the court sustained objection, but later on in his testimony he was permitted, without objection, to say: "Yes, sir, I named to her about giving me a bad disease." We therefore conclude that in the light of the condition of the record this point is far from being meritorious.

It is sufficient to say in response to the point (b) that the record contradicts the facts upon which it is based, which facts are attempted to be supported only by affidavit of defendant's counsel. However, if what he states was the true situation, it would not constitute an error, much less a prejudicial one. Point (c) is also manifested in no other way than the filing of an affidavit by counsel in which he not only stated the ground of the objection (i. e., that the named juror slept during the trial), but he also swore that he was aware of it all the time, but he made no objections until after the verdict. However, that juror, and perhaps other offered testimony, proved that counsel was in error and that the particular juror was a man advanced in age, but physically and mentally active, and he stated him-

self that he heard and weighed all of the testimony introduced at the trial.

We deem a further discussion of the case unnecessary. A more extended elaboration of the testimony would not detract from its convincing quality, nor weaken its substance as above given. The penalty is the severest one approved by the law, but if the commonwealth's testimony is to be believed—and we can find no reason why it should not—defendant committed an inexcusable murder, and therefore invited the penalty that the jury gave him. Our sympathy for him, because of his unfortunate predicament, should not lead us away from the path of duty, and which is to approve the judgment of the trial court unless prejudicial error has been committed.

We have been unable to find any and are constrained to affirm the judgment, which is accordingly done.

The whole court sitting.