## Davenport v. Commonwealth.

March 7, 1941.

630

Charles Ferguson, H. H. Lovett and J. C. Cannaday for appellant.

Hubert Meredith, Attorney General, and A. E. Funk, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Reversing.

The defendant, J. C. Davenport, was convicted of

murdering his wife and his punishment was fixed at life imprisonment. He assigns eight errors in seeking to reverse the judgment: 1. The indictment was defective; 2. he was entitled to a peremptory instruction, if not, then the verdict is flagrantly against the evidence; 3. evidence was introduced against him which was secured through an unlawful search of his home and store; 4. the court failed to instruct the jury on the whole law of the case, and an incorrect instruction was given; 5. the court erred in the admission of impeaching testimony against him and his witnesses, and in rejecting competent character testimony offered in his behalf; 6. as the sheriff and a deputy were material witnesses against defendant, they should not have been put in charge of the jury, also they failed to heed the court's admonition; 7. the names of expert witnesses did not appear on the indictment, also they did not qualify as experts; 8. improper argument by counsel representing the Commonwealth.

A brief resumé of the evidence is necessary for a decision of the case. Defendant was a widower with five children, all of whom were married and had homes of their own, except Junior, a 14 year old boy who lived with his father. Mrs. Davenport was a divorcee with four children, ranging in ages from 7 to 17, all of whom resided with her in the home of their stepfather. She was 36 years of age and had been divorced about seven years. Defendant was 62 years of age when they married in the summer of 1938. He operated a general store at Salem in Livingston County, with his residence immediately adjoining, and a door connected the store with the bed room occupied by the couple. Their bed room was shared with Mrs. Davenport's 7 year old daughter, Lavern. Her three boys ranging from 13 to 17 years of age and Junior Davenport slept upstairs almost directly over their parents' room. The sleeping quarters of the boys was reached by a stairway ascending from the dining room just behind Mr. and Mrs. Davenport's bed room.

The family appeared to be happy. Mrs. Davenport assisted her husband in the store; he usually had domestic help for her about the home; and the children and their stepfather got along well together. There was no trouble between defendant and his wife and her children outside of the small upsets occurring occasionally

in most families. The Commonwealth proved no motive which would prompt defendant to kill his wife.

About 4 o'clock on the morning of Friday, Oct. 27, 1939, James Hill, the 17 year old son of deceased, was awakened by the screams of his 7 year old sister and defendant calling him. The electric lights were off. He rushed downstairs partly dressed, obtained a flash light and found his mother dead lying across the bed in her night clothes with one arm almost reaching the floor and a large puddle of blood on the floor near the center of the bed. He found defendant in the adjoining living room lying on the floor in his underwear in which he had slept. James obtained an electric fuse, soon had the lights burning and he, or some near neighbors who had come in, summoned Dr. Waddell, Sheriff McCandless and an undertaker, all of whom arrived around 4:30.

Dr. Waddell testified Mrs. Davenport had been dead from one to two hours and that she died as a result of three wounds, each about one and a quarter or one and a half inches long, one over each ear and the third near the center of the back of her head. Each wound went to the brain and any of the three was capable of producing almost instant death. There were a couple of marks on each side of her throat. The doctor testified the defendant was lying on the floor in the living room with blood splotches on his underwear. His face was smeared with dry blood but upon looking in his nose with a flash light, no coagulated blood was revealed. Defendant testified his nose bled a good bit through the day, Saturday, and he was unconscious and does not remember talking to Dr. Waddell, the sheriff or others who testified he conversed rationally with them soon after the crime was discovered. His daughter, Miss Lovey, and his son, Junior, testified defendant's nose was bleeding while he was lying on the floor and on the davenport soon after his wife's body was found, and they gave him handkerchiefs which he used in blowing his bloody nose. Dr. Waddell found a slight swelling behind defendant's right ear and a wound in the back of his head but the skin was not broken, and he was perfectly conscious with good pulse and respiration. However, he gave defendant a hypodermic. In the opinion of Dr. Waddell, Mrs. Davenport's wounds might have been inflicted by an iron bar (hereinafter referred to) by licks made with it when held in a position parallel

with the floor; also, that the bar could have inflicted defendant's wounds had he been struck lightly with it. There were some 35 or 36 spots of blood on the wall between the bed room and the living room and some 5 or 6 such spots on the wall between the store and the bed room.

Defendant testified to the effect that Friday was pay-day at the mines and he had taken in considerable cash and from $60 to $70 in checks. Upon closing his store that night he put the cash in his pants pocket, leaving the checks and some change in the cash drawer. During the night his wife woke him, saying there was somebody breaking in the store. He regarded it as a false alarm, dosed off to sleep, and she aroused him again. This time he got out of bed, obtained his pistol from a nearby chiffonier and at the request of his wife threw his pants to her. Just as he passed from the bed room through the archway to the living room, going in the direction where he heard the noise, he was struck on the head and thrown against a chair. As he raised his arm he was hit again and this was the last he remembered until he regained consciousness sometime around 6 o'clock in the morning. Besides the two licks on the head he was scratched on the right arm. He was robbed of some $165 in cash, his pistol, his watch; also, his wife's watch and keys were taken. The cash drawer in the store was found opened with the change taken from it, but the checks were intact. The next day 14c was found near a gas pump in front of the store.

Sheriff McCandless and Albert Agee, night watchman in Marion, and Driskill, a deputy sheriff, were going through defendant's home and store soon after their arrival on the scene looking for clues as to the perpetrator of the crime. Agee found an iron bar about an inch in diameter and some two and half feet long with a bent, or turned-up, end on a shelf in a feed room adjoining the store on the opposite side from defendant's dwelling. A butcher knife was found on the floor near the bed. It and the iron bar, the cash drawer and a door knob from the front door were taken to a finger print expert in Paducah, but he was unable to develop any finger prints on any of these objects. Henry C. Freimuth, of Washington, D. C., thoroughly qualified as a technical chemist, with the degrees of Bachelor of Science and Doctor of Philosophy from New York Uni-

versity. He has had three and a half years' experience in making chemical analysis concerning the determination and typing of human blood, and has been with the Federal Bureau of Investigation for more than a year. Miss Mildred Lennehen of Paducah, a graduate of Gradwohn, with hospital experience and with four years' experience in making blood tests, qualified as an expert laboratory technician. Both of them testified the blood on this iron bar was human blood, but there was not sufficient blood on it to determine into which of the four groups of human blood it classified.

The defendant voluntarily gave a sample of his blood; also, voluntarily delivered his underwear to the sheriff. These, together with three handkerchiefs which were found in his home, a piece of bed ticking and sheets from his wife's bed, the iron bar, a piece of wall paper from the bed room, and possibly some other objects, were sent to Dr. Freimuth to make blood tests therefrom. Dr. Freimuth testified how human blood is distinguished from that of the lower animals and how it groups into four classifications, O, A, B, and AB, and the procedure to go through in making the test. After fully explaining how he made his tests, the doctor testified defendant's blood was found to be in group A; that the blood found on the bed ticking and the underwear was in group O. It does not appear in the record into which of the four groups Mrs. Davenport's blood classified. He found human blood on the wall paper, the iron bar and on one of the three handkerchiefs, but none of such articles contained sufficient quantities to enable him to group the blood thereon. One of the bed sheets had been burned, the other contained formaldehyde (presumably used in embalming Mrs. Davenport) which prevented blood tests from being made on them.

There was testimony for the Commonwealth that when the iron bar was found with blood on it, this was immediately reported to defendant, and he replied that it meant nothing as he had used the bar in killing chickens, rats and a dog. Defendant denied making such statements. However, he admitted that some months before his wife was killed he and the boys had used this bar in killing rats in the store; also, on one occasion while opening a keg of nails with the bar he hurt his finger, but does not know whether blood from his finger got on the bar.

The accusatory part of the indictment charged defendant with the murder of his wife "with malice aforethought"; and the descriptive part alleged he struck her with a deadly weapon "with the wilful, felonious and malicious intent to kill her, from which she then and there died." Complaint is made that the descriptive part of the indictment did not describe the killing as being done with malice aforethought. Such criticism is not well taken. It is difficult to conceive how an indictment charging murder with malice aforethought could better describe the commission of the offense than by averring the defendant struck his victim with a deadly weapon with the wilful, felonious and malicious intent to kill her. This indictment fully complies with Section 122, Subsection 2, and Section 124, Subsection 4, Criminal Code of Practice. Jones v. Com., 273 Ky. 444, 116 S. W. (2d) 984.

It cannot be argued with reason that defendant was entitled to a peremptory instruction or that the verdict is flagrantly against the evidence. We have written many times that any evidence, even though slight or circumstantial, which tends to establish the guilt of the accused of any degree of the offense charged is sufficient to take the case to the jury and sustain a conviction, unless the verdict is so flagrantly against the evidence as to shock the conscience or lead to the conclusion that it was the result of passion or prejudice rather than the deliberate consideration of the jury. Gambrel v. Com., 283 Ky. 816, 143 S. W. (2d) 514; Harlan v. Com., 253 Ky. 1, 68 S. W. (2d) 443; Russell v. Com., 276 Ky. 38, 122 S. W. (2d) 1009. It was for the jury to determine from all the evidence whether or not defendant killed his wife and no argument is necessary to demonstrate that the evidence recited is ample not only to take the case to the jury but to support the verdict.

Defendant vigorously objected to the introduction in evidence of the iron bar and the rag, or handkerchief, upon which blood was found and to other exhibits, contending they were seized from his home by an illegal search in violation of Section 10 of the Kentucky Constitution and the Fourth Amendment of the Federal Constitution. We need not concern ourselves with the underwear, one of the sheets and the bed ticking. On the day of the coroner's inquest defendant voluntarily delivered his bloody underwear to the officers. One of

the sheets was given them by the undertaker who removed it from defendant's home while it was around his wife's body. The bed ticking was delivered to the officers by Dosie Hill, to whom defendant gave it on Monday morning following the death of his wife. The finding and taking of the other articles from defendant's home by the officers was not through an unreasonable search and seizure prohibited by the State and Federal Constitutions. A murder had been committed in defendant's home in the late night or early morning hours, and members of his household, upon discovering the dead body of his wife and his own prostrate form (when, as he testified, he was in an unconscious condition), hurriedly summoned a doctor, an undertaker and the officers. The doctor ministered unto him; the undertaker took charge of his wife's body, and naturally the officers looked around the premises in an effort to determine how and with what weapons the crime was committed and for clues to establish the perpetrator thereof. The officers were not searching for evidence against the defendant—at that time he was not suspected of the deed, but they were intent upon rendering him service and assistance. If defendant was unconscious (as he claimed), this would not convert the search by the officers into one without his consent, because his subsequent actions in voluntarily delivering to them his bloody underwear and voluntarily submitting a sample of his blood and giving the bed ticking to Dosie Hill, show conclusively the search and investigation the officers made in his home and store met with his approbation.

Defendant relies upon Youman v. Com., 189 Ky. 152, 224 S. W. 860, 13 A. L. R. 1303, as sustaining his position this search was without his consent. In Banks v. Com., 190 Ky. 330, 227 S. W. 455, 457, it was written:

"The 'search and seizure' which the opinion in the Youman Case forbids is a compulsory one, or one made in opposition to the will of the person in possession of the searched premises and to which he is compelled to submit, and is one made without his voluntary permission, *and therefore a forcible one rendering the searcher a trespasser ab initio.* It was not intended by the court in that opinion to hold that it would be unlawful or incompetent to search premises with the knowledge and permission

of the one lawfully in possession thereof.'' (Our italics.)

Here, the officers in good faith were invited into defendant's home to investigate a murder and his subsequent conduct shows he approved of their action. Where a search is made without objection on the part of the owner of the property, the search is legal and evidence obtained thereby is competent. Patton v. Com., 273 Ky. 258, 116 S. W. (2d) 311.

Defendant's alleged unconscious condition at the time of the search in the circumstances of this case did not require the court to submit for the jury's determination whether or not he consented to the search. His subsequent actions ratified the search to such an extent as to show conclusively it was not made against his consent. However the chief attack made against the instructions is that they did not contain the whole law of the case, since they only covered murder and reasonable doubt and no instructions were given on manslaughter and self-defense. It is argued that as there was no eye witness to the killing and as there was evidence of a struggle, the court should have instructed on every degree of the crime that might possibly apply in order that the jury might return a verdict consistent with any state of facts it might believe existed from the evidence, and we are cited to Bond v. Com., 257 Ky. 366, 78 S. W. (2d) 1; Fletcher v. Com., 239 Ky. 506, 39 S. W. (2d) 972; Frasure v. Com., 169 Ky. 620, 185 S. W. 146.

Counsel clearly state the rule but appear to lose sight of the fact that defendant testified in effect as to how the killing occurred and that he had no connection therewith. The substance of his testimony is that burglars were in his home and when he arose from his bed to investigate he was knocked unconscious, and while he was in that condition the burglars killed his wife and robbed him and her. Such testimony is consistent with his innocence, but it is thoroughly inconsistent with the theory or fact that he killed her in sudden heat of passion or in a reckless manner, or that he acted in self-defense. Frasure v. Com., supra, forcibly points out that where the evidence is entirely circumstantial and only establishes the corpus delicti, and other circumstances from which defendant's connection with the crime might be inferred, the court should instruct on all

phases of homicide; but where defendant testifies to facts showing how the killing occurred and where there is no room for any possible theory except he is guilty of murder or he is innocent, there is no reason for the court to give the manslaughter and self-defense instructions. See Wellington v. Com., 158 Ky. 161, 164 S. W. 333. No case is cited to us and we have found none wherein this court has approved instructions covering all the degrees of homicide where defendant testified and the facts showed he was guilty of the crime of murder or else he had not committed the crime, Crenshaw v. Com., 227 Ky. 223, 12 S. W. (2d) 336; Carter v. Com., 258 Ky. 807, 81 S. W. (2d) 883; Canada v. Com., 281 Ky. 641, 136 S. W. (2d) 1061; O'Brien v. Com., 89 Ky. 354, 12 S. W. 471, 11 Ky. Law Rep. 534; Bast v. Com., 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967; Wilson v. Com., 166 Ky. 301, 179 S. W. 237; Bowlin v. Com., 195 Ky. 600, 242 S .W. 604. It is where the evidence is wholly circumstantial, and there is no eye-witness and there is some evidence of a struggle and defendant does not testify as to how the killing occurred, that the court must give all the law on homicide. Fletcher v. Com., 239 Ky. 506, 39 S. W. (2d) 972; Brown v. Com., 117 Ky. 766, 767, 78 S. W. 1126, 25 Ky. Law Rep. 1896; Rutherford v. Com., 13 Bush 608; Bates v. Com., 284 Ky. 1, 143 S. W. (2d) 730; Sewell v. Com., 284 Ky. 183, 144 S. W. (2d) 223. It is written in Canada v. Com., supra, that the propriety of giving all the instructions in a homicide case is based on the circumstances showing the possibility of a basis for the manslaughter and self-defense instructions. In the case at bar there was no possible basis for the giving of either of these instructions.

In the fourth instruction the court gave defendant's theory of the case, telling the jury in effect that if some person other than the defendant killed Mrs. Davenport, defendant should go acquitted. This instruction was entirely unnecessary. The instruction submitting the Commonwealth's theory of the case was in such language that the jury could easily understand it and its negative fully covered the defense of the accused; hence it was unnecessary to give an affirmative instruction embodying his theory. Duvall v. Com., 225 Ky. 827, 10 S. W. (2d) 279; Abshire v. Com., 281 Ky. 470, 136 S. W. (2d) 567.

In rebuttal the Commonwealth introduced the sheriff, McCandless, who testified that he knew defendant's general reputation for morality, also for veracity, from what people in the community said, and that both reputations were bad. Driskill, a deputy sheriff, was asked the same question concerning defendant's general reputation for veracity and testified it was bad. On cross-examination each of these witnesses was asked to name persons whom they had heard discuss defendant's reputation. The sheriff after naming two such persons refused to name any more, saying, "I think they wouldn't want you to ask them that question." Driskill's reply was, "I'm not going to name any one." The court overruled defendant's objections to these witnesses refusing to answer such questions and they were never required to answer. These witnesses could only testify that defendant's reputation for morality and veracity was bad from what they had heard people say who knew and associated with him, but they could not testify from their own personal knowledge or experience with him. McDonald v. Com., 86 Ky. 10, 4 S. W. 687, 9 Ky. Law Rep. 230; White v. Com., 80 Ky. 480, 4 Ky. Law Rep. 373. Not to require them to divulge on cross-examination the names of their informants was a denial of the right to cross-examine, and is reversible error. 70 C. J. 681, Section 788; State v. Bigham, 133 S. C. 491, 131 S. E. 603; Cumberland R. Co. v. Girdner, 174 Ky. 761, 192 S. W. 873; Louisville & N. R. Co. v. Gregory, 284 Ky. 297, 144 S. W. (2d) 519. That a person's general reputation for morality or veracity is bad may be shown only by positive testimony that his neighbors and associates have so spoken of him until such has become a part of his general reputation. It must be proved by affirmative testimony. But such is not the rule when one would prove his general reputation for morality and veracity is good.

While it does not appear that this court has spoken upon this direct question the courts of other jurisdictions have. Where a witness knows accused and the people in the community wherein he resides and has been in such position as he probably would have heard any derogatory statements concerning accused, and he testifies he has never heard aught said against his character or reputation, or that he never heard it discussed, he is a competent witness to testify that the accused's

general reputation in the community is good. The reason for the rule is that one whose word and morals are accepted by his associates and neighbors in the community in which he lives, would ordinarily excite no discussion or comment, and he or she will be accepted in the community as a person whose veracity and morals are not subject to criticism. Silence may indicate an exceedingly fine reputation, and it was written in Lemons v. State, 4 W. Va. 755, 6 Am. Rep. 293: "The more unsullied and exalted the character, the less likely it is ever to be called in question." This is the rule laid down by the text writers and is followed in the great majority of the States in the Union. 1 Wharton's Criminal Law, 11th Ed., 465, Section 334; Underhill's Criminal Evidence, 3d Ed., 180, Section 140; People v. Dunham, 344 Ill. 268, 176 N. E. 325; People v. Hoffman, 199 Cal. 155, 248 P. 504; People v. Van Gaasbeck, 189 N. Y. 408, 82 N. E. 718, 22 L. R. A., N. S., 650, 12 Ann. Cas. 745; State v. Leabo, 120 Or. 160, 249 P. 363; State v. Baldanzo, 106 N. J. L. 498, 148 A. 725, 67 A. L. R. 1207, and annotation following.

J. C. Parsons, who had been circuit clerk for twelve years, and who had been master commissioner, post master and president of a bank, was called as a character witness for the defendant. He testified he knew defendant, also, he knew the people residing in defendant's community and was acquainted with his reputation for peace and quietude from what the people said about him, and that reputation was good. Mr. Parsons further testified defendant's general reputation for veracity was good from what people said about him. On cross-examination this witness was asked, "Had you heard it discussed," to which he answered, "No more than yours or mine would be. * *, * There was no occasion for it." Thereupon, the court excluded Mr. Parson's testimony for the reason that he had never heard defendant's reputation discussed, therefore he could not testify it was good. From what is said in the above paragraph and the authorities therein referred to, this was error on the part of the court. Furthermore, it was prejudicial error because it deprived defendant of an important and material witness.

There is much complaint in defendant's brief that the court improperly admitted evidence of his general moral character and as to particular traits or elements

of character having some relation as to the nature of the offense with which he was charged, before he attempted to establish a good character in this respect; also, that the court did not limit such evidence to the time before the discovery of the commission of the offense. Complaint is further made that the court did not require persons testifying as to defendant's reputation for veracity to properly qualify as to knowing his reputation from what they had heard people say who lived in the same community with the defendant. Without going into detailed discussion of the difference between general moral character having some relation to the offense charged, which is substantive evidence, and evidence relating to defendant's character as a witness, which must first be attacked by the Commonwealth, and without discussing the testimony of the various witnesses to which objections were made, it will suffice to merely refer to two cases where these questions are discussed. In Shell v. Com., 245 Ky. 223, 53 S. W. (2d) 524, and Clair v. Com., 267 Ky. 363, 102 S. W. (2d) 367, such evidence is exhaustively gone into and the rule is clearly laid down covering the introduction thereof. On another trial these cases will guide the court on the subject of character evidence and impeaching evidence.

Sheriff McCandless, and his deputy, Driskill, were each witnesses against defendant as to material facts and to conversations had with him. In addition thereto, each was a character witness against him. For these reasons defendant urges they should not have been placed as guards over the jury, and that another deputy sheriff, Hughes, who was not a witness, should have been placed in charge of the jury. The record does not show any objection was made by defendant to McCandless and Driskill being placed over the jury and the matter was not called to the court's attention until his motion for a new trial was filed. Had seasonable objection been made, it is reasonable to suppose the court could have placed the jury in charge of Hughes and not have left it in charge of two men who were material witnesses against defendant. Errors are waived if presented for the first time in a motion for a new trial. Smith v. Com., 258 Ky. 482, 80 S. W. (2d) 565; Fowler v. Com., 260 Ky. 433, 86 S. W. (2d) 148; Pennington v. Com., 262 Ky. 707, 91 S. W. (2d) 21. Defendant further objected that McCandless and Driskill did not enforce

the admonition of the court that the jurors should not read newspaper accounts of the trial. No competent testimony was introduced as to the jurors reading newspaper accounts of the trial, as a juror may not give testimony to impeach the verdict, Section 272, Criminal Code of Practice; Gleason v. Com., 145 Ky. 128, 140 S. W. 63, Ann. Cas. 1913B, 757; Wolf v. Com., 214 Ky. 544, 283 S. W. 385. But there is some testimony that the jurors were given access to newspapers containing accounts of the trial.' On another trial the court's admonition in this respect will be strictly enforced.

It is argued defendant's motion to quash the indictment should have been sustained because the names of some of the Commonwealth's expert witnesses did not appear on the indictment in conformity with Section 120 of the Criminal Code of Practice. That section provides for the placing on the indictment the names of the witnesses who appeared before the grand jury. But it is not contended that the expert witnesses for the Commonwealth testified before the grand jury and there is no rule that the Commonwealth on the trial is limited to only such witnesses as appeared before the grand jury. Wiley v. Com., 229 Ky. 63, 16 S. W. (2d) 496, and authorities therein cited.

The bill of exceptions shows that much improper argument was indulged in by the attorneys representing the Commonwealth in that they made assertions not supported by the evidence. Such as, defendant has been laughing ever since his wife died; that he was dancing around out there before his wife's body was cold; that defendant answered that he did not know the little girl was born after her mother's divorce, when the fact is that he testified to just the opposite. The Commonwealth attorney made the positive statement in his argument that defendant killed his wife. We have many times said the representatives of the Commonwealth in arguing the facts should confine themselves to the evidence coming from the witness stand. When inferences are drawn from the evidence, they should be stated as inferences and not as facts shown by the evidence, otherwise the jury may confuse the inferences drawn in the argument with the facts proven. Nash v. Com., 240 Ky. 691, 42 S. W. (2d) 989. While the above mentioned arguments were improper we do not regard them as so prejudicial as to constitute reversible error. St. Clair

v. Com., 245 Ky. 730, 54 S. W. (2d) 1; Carter v. Com., 278 Ky. 14, 128 S. W. (2d) 214. On another trial of the case, the court will see that such arguments are not resorted to by representatives of the Commonwealth.

The court excluded the testimony of Lavern Hill because he was of the opinion the child's mind was not sufficiently mature to enable her to qualify as a witness. At the time her mother was murdered Lavern lacked two months of being eight years old, and at the time she testified she was about three months over that age. One of the defense counsel, Mr. Ferguson, said in his argument that Lavern did not qualify as a witness and could not testify. Mr. Moore, counsel employed to assist the Commonwealth, in his argument said: "I will tell you why she (Lavern) didn't testify. Who objected? It was because counsel for defendant objected." Counsel for the defendant had the right to object to this child testifying if they did not think she qualified as a witness. It would be reversible error for the prosecution in their argument to refer to the fact that the defense objected, had it not been made in answer to Mr. Ferguson's argument that the child did not qualify as a witness. It was written in Louisville & N. R. Co. v. Gregory, 284 Ky. 297, 144 S .W. (2d) 519, that counsel in argument cannot comment on objections to testimony made by opposing counsel and sustained by the court. As the bill of exceptions here shows this argument was made in answering the argument of the defense as to why the child did not testify, it cannot be held prejudicial to the defendant. Fletcher v. Com., 250 Ky. 597, 63 S. W. (2d) 780.

Lavern testified that she was eight years old; that her birthday was Christmas; that she lived with Bessie Belt at Marion; that if she did not tell the truth she would go to the "bad man." When asked if she went to Sunday school, she shook her head in the negative. Out of 15 questions asked her, the child gave no answer to seven, shook her head as to one and intelligently answered the other seven. In Leahman v. Broughton, 196 Ky. 146, 244 S. W. 403, this court went exhaustively into the question of a child of tender years qualifying as a witness. In Jones v. Com., 267 Ky. 465, 102 S. W. (2d) 345, 347, the court quoted from Meade v. Com., 214 Ky. 88, 282 S. W. 781:

" 'There is no unalterable rule measuring the com-

petency of a witness because of his or her age, and * * * the true test is: Whether the witness possesses sufficient intelligence to truthfully narrate the facts to which his attention is directed and about which he may be inquired.' The case of Leahman v. Broughton, 196 Ky. 146, 244 S. W. 403, wherein the same rule was announced, was referred to in the Meade opinion and this excerpt was taken therefrom: 'Regardless of its age, if it (infant) is shown to possess sufficient intelligence and sense of obligation to tell the truth, although it is unable to explain or even comprehend the mysteries of the future life,' competency is established.''

The Leahman case also fixes the date of the competency or incompetency as of the time the child is offered as a witness and not at the time the facts about which it is testifying occurred. Whitehead v. Stith, 268 Ky. 703, 105 S. W. (2d) 834, was reversed because the five year old plaintiff was unable to qualify as a witness. But on a second trial of that case, reported in 279 Ky. 556, 131 S. W. (2d) 455, the plaintiff was eight years of age, qualified as a witness, and the judgment in his favor was affirmed. If Lavern meets the test laid down in the Meade case, supra, she will be a competent witness on another trial of this case.

The judgment is reversed for proceedings consistent with this opinion.