Cheryl Lynn GABOW, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

James Cecil, Appellant,

v.

Commonwealth of Kentucky, Appellee.

No. 1998–SC–0377–MR, 1998–SC–0441–MR.

Supreme Court of Kentucky.

Oct. 26, 2000.

As Amended Nov. 8, 2000.

Rehearing Denied Jan. 25, 2001.

Richard Hoffman, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant Cheryl Lynn Gabow (1998–SC–0377–MR).

A.B. Chandler, III, Attorney General, Elizabeth A. Heilman, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee Commonwealth of Kentucky (1998–SC–0377–MR).

Lawrence F. Smith, Smith Law Office, Radcliff, Counsel for Appellant James Cecil (1998–SC–0441–MR).

A.B. Chandler, III, Attorney General, Ian G. Sonego, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for

Appellee Commonwealth of Kentucky (1998–SC–0441–MR).

COOPER, Justice.

Cheryl Gabow and her domestic companion, David Brangers, hired James Cecil and Samuel McMillen to kill Gabow's husband, Frederick Gabow. On February 17, 1995, McMillen shot and killed Frederick Gabow at Mr. Gabow's residence in Radcliff, Kentucky. McMillen, Cecil, Brangers and Cheryl Gabow all confessed to their respective involvements in the killing and all were indicted for murder. Prior to trial, Brangers was allowed to plead guilty to criminal facilitation of murder and to accept a sentence of five years in prison in exchange for his testimony against the others. The charge against McMillen was severed when a question arose as to his mental competency to stand trial. James Cecil and Cheryl Gabow were then tried jointly and both were convicted of murder and sentenced to life in prison without benefit of probation or parole for twenty-five years. They appeal to this Court as a matter of right. Ky. Const. § 110(2)(b).

## I. FACTS.

David Brangers was the only participant in the conspiracy who testified at trial. According to Brangers, Cheryl and Frederick Gabow were in the process of a divorce; and Cheryl believed that if her husband died before the divorce became final on February 20, 1995, she could collect the proceeds of his $200,000.00 National Guard life insurance policy. Cheryl Gabow agreed to pay Cecil and McMillen $10,000.00 of the life insurance proceeds to kill Frederick Gabow. On the night of February 17, 1995, local police officers came to the Brangers/Gabow residence and advised that Frederick Gabow had been shot and was at the hospital. On February 18th, Cecil and McMillen came to the Brangers/Gabow residence and described how McMillen had shot Frederick Gabow through a window of his residence, then entered the residence and shot him

again. According to Brangers, Cheryl was upset that her husband was still alive (he died the next day), because "he was not supposed to suffer."

In her confession, Cheryl Gabow admitted hiring Cecil and McMillen to kill her husband so that she could collect the life insurance proceeds. However, she also claimed that several days before the murder, she advised both Cecil and McMillen that she "didn't want it to happen, that she didn't want them to do anything," and that she did not see Cecil again until the day after the murder. Later in her confession, she claimed to have had a subsequent conversation only with Cecil, in which she repeated her renunciation and in which Cecil also renounced any further interest in the plot. Cecil's confession does not mention a renunciation either by himself or by Cheryl Gabow. His version of this conversation was that he told Cheryl that McMillen had gotten drunk and disappeared with the gun; that Cheryl told him that "it needed to be done" before Monday because she was going to sign the divorce papers on Monday or Tuesday; and that he (Cecil) promised her it would be done before Monday. Brangers claimed to have been present during this conversation. He testified that upon being advised that McMillen was drunk and had disappeared with the gun, Cheryl remarked that things were getting "sticky" and "maybe we should back off," whereupon Cecil responded that the job would be done even if he (Cecil) had to stab Mr. Gabow to death with a knife.

In their confessions, Cecil and McMillen admitted that they agreed to kill Frederick Gabow in exchange for payment of $10,000.00; that Cecil obtained the murder weapon from a friend of his brother; and that Cecil drove McMillen from Elizabethtown to the victim's residence in Radcliff where McMillen shot and killed Gabow. At trial, the Commonwealth relied primarily on the testimony of Brangers and the redacted confessions of McMillen, Cecil

and Cheryl Gabow.[1] McMillen's confession was redacted to delete any reference to either Cecil or Gabow; Cecil's confession was redacted to delete any reference to Gabow; and Gabow's confession was redacted to delete any reference to Cecil. Thus, the confessions of both Cecil and Gabow were redacted to delete any reference to the conversation in which Gabow claimed to have renounced her role in the conspiracy.

The defense of voluntary and complete renunciation is defined in KRS 502.040(2):

A person is not guilty under KRS 502.010 or 502.020 for an offense committed by another person when:

. . .

(2) Prior to the commission of the offense, he manifests a voluntary and complete renunciation, as defined in KRS 506.060, of his criminal purposes and:

(a) Deprives his prior effort of its effectiveness in such commission; or

(b) Gives timely warning to the proper law enforcement authorities

*or otherwise makes proper effort to prevent commission of the offense.* (Emphasis added.)

■■■ At the conclusion of the Commonwealth's case-in-chief, Gabow announced her intention to introduce her own unredacted videotaped confession, including the portion pertaining to her claimed renunciation.[2] Since Gabow's unredacted confession inculpated Cecil, the trial judge bifurcated the remainder of the trial per *Kinser v. Commonwealth,* Ky., 741 S.W.2d 648 (1987) so that Cecil's case could be tried to a conclusion before the introduction of Gabow's defense. Cecil was convicted and his trial proceeded to the penalty phase, during which he was permitted to introduce his own unredacted videotaped confession,[3] presumably in support of his claim of the accomplice mitigating factor. KRS 532.025(2)(b)5. At the conclusion of the penalty phase of Cecil's trial, the guilt phase of Gabow's trial was resumed and her case was tried to a conclusion. Gabow did not testify in her own behalf, but introduced her unredacted

1. Although Cecil's statement was admissible *against him* and Gabow's statement was admissible *against her* as admissions, KRE 801A(b)(1), McMillen's statement could have been admitted only as a statement against his own penal interest under KRE 804(b)(3). A hearsay statement is admissible under that exception only if the declarant is "unavailable" as defined in KRE 804(a). The record is silent as to the unavailability of McMillen as a witness. However, the issue is not raised by either party; thus, we assume that McMillen was deemed unavailable because of a "then existing . . . mental illness or infirmity" which prevented him from testifying. KRE 804(a)(4).

2. The record does not reflect under what theory Gabow was permitted to introduce her own unredacted confession. Her confession was clearly hearsay, and the admissions exception under which the Commonwealth introduced the redacted version, KRE 801A(b)(1), applies only to statements offered *against* a party. While the rule of completeness, KRE 106, permits a party against whom a statement is introduced to introduce any other part of the statement "which ought in fairness to be considered contemporaneously

with it," the rule does not mean the entire document may be admitted into evidence, "but only so much as concerns the specific matter the opposite party opened up." *White v. Commonwealth,* 292 Ky. 416, 166 S.W.2d 873, 877 (1942). "The completeness doctrine is based upon the notion of fairness—namely, whether the meaning of the included portion is altered by the excluded portion." *Commonwealth v. Collins,* Ky., 933 S.W.2d 811, 814 (1996). "The objective of that doctrine 'is to prevent a misleading impression as a result of an incomplete reproduction of a statement.'" *Id.* (quoting R. Lawson, *The Kentucky Evidence Law Handbook* § 1.20, at 48 (3d ed. Michie 1993)). This does not mean that by introducing a portion of a defendant's confession in which the defendant admits the commission of the criminal offense, the Commonwealth opens the door for the defendant to use the remainder of that out-of-court statement for the purpose of asserting a defense without subjecting it to cross-examination.

3. See discussion *supra* note 2.

videotaped confession in support of her defense of renunciation.

## II. CECIL'S APPEAL.

■ Cecil asserts six errors on appeal: (A) denial of his right to a speedy trial; (B) failure to sever his trial from that of Gabow; (C) admission at trial of the confessions of McMillen and Gabow; (D) failure to instruct on criminal facilitation of murder as a lesser included offense; (E) separation of jurors and *ex parte* communication between the judge and jurors during jury deliberations; and (F) ineffective assistance of counsel. This last claim was not presented to the trial judge for consideration, thus is not ripe for consideration on appeal. *Humphrey v. Commonwealth,* Ky., 962 S.W.2d 870, 872 (1998).

### A. Speedy trial.

Cecil was arrested on February 28, 1995 and indicted on April 26, 1995. His trial did not begin until February 23, 1998. During the interim, Cecil's counsel filed two motions for a speedy trial, first on August 6, 1996 and again on March 31, 1997. On May 12, 1997, Cecil filed a *pro se* statutory speedy trial demand under KRS 500.110.[4] Meanwhile, McMillen, who was a juvenile when the murder was committed, had filed a petition for a writ of prohibition in the Court of Appeals[5] challenging the constitutionality of KRS 635.020(4), the statute under which he was transferred from juvenile court to circuit court to stand trial as an adult. When that petition was denied, McMillen exercised his right under Section 115 of our Constitution to appeal that denial to this Court.[6] A stay of proceedings was entered on October 24, 1995 and remained in effect until April 24, 1997.[7] On May 21, 1997, the trial court entered an order scheduling the trial for October 27, 1997. On October 8, 1997, McMillen filed a motion for a continuance primarily on grounds that his expert witness was unavailable for the October 27, 1997 trial date. On October 17, 1997, McMillen filed a motion for a psychiatric examination to determine his mental competency to stand trial; and on October 20, 1997, McMillen filed an additional motion to discover the personnel records of those officers of the Radcliff Police Department who had participated in investigating the murder and obtaining the defendants' confessions. During the last two weeks before trial, all four defendants filed motions for severance and motions to exclude the death penalty as a potential punishment. On the morning of trial, an order was entered continuing the trial date generally. The record does not reflect the reason for the continuance or that any of the defendants objected to the continuance. The trial was subsequently rescheduled for February 23, 1998.

■ Cecil's statutory speedy trial claim under KRS 500.110 is easily discarded. That statute applies only when a defendant is incarcerated for one offense and a detainer has been lodged against him to answer for another offense. *Cf. Huddleston v. Jennings,* Ky.App., 723 S.W.2d 381, 383 (1986). It does not apply where, as here, a defendant is seeking a speedy trial of an offense for which he is being held in pre-trial incarceration. Under that circumstance, a speedy trial demand is treated as an assertion of the right to a speedy trial guaranteed by the Sixth Amendment of the United States Constitution and Section 11 of the Constitution of Kentucky.

---

4. Cecil filed several additional *pro se* motions to remove his court-appointed counsel on grounds that his counsel had failed to move for a speedy trial. However, he filed only one actual *pro se* motion demanding a speedy trial. *Cf. McDonald v. Commonwealth,* Ky., 569 S.W.2d 134 (1978), *cert. denied,* 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979).

5. 95–CA–2052.

6. 95–SC–889–MR.

7. The constitutionality of KRS 635.020(4) was upheld in *Commonwealth v. Halsell,* Ky., 934 S.W.2d 552 (1996). McMillen's appeal was abated pending the outcome of *Halsell.*

■ Four factors are considered in determining whether the Constitutional right to a speedy trial has been violated: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). No single one of these factors is ultimately determinative by itself.

A defendant's constitutional right to a speedy trial cannot be established by any inflexible rule but can be determined only on an *ad hoc* balancing basis, in which the conduct of the prosecution and that of the defendant are weighed.

*Id.* at 514, 92 S.Ct. at 2184.

■ The inquiry first must be triggered by a presumptively prejudicial delay. There is no bright line rule for determining what length of delay suffices to trigger the inquiry, but actual prejudice need not be proven to establish a presumptively prejudicial delay. In *Barker v. Wingo*, *supra*, a five year delay was held presumptively prejudicial for a trial for murder; in *McDonald v. Commonwealth*, *supra* note 4, a three year delay was held presumptively prejudicial for a trial for indecent and immoral practices, assault and battery, and rape; and in *Preston v. Commonwealth*, Ky.App., 898 S.W.2d 504 (1995), a forty-one month delay was held presumptively prejudicial for a trial for drug possession. We conclude that the thirty-four month delay between indictment and trial in this case was a presumptively prejudicial delay triggering further inquiry into the reason for the delay and whether any prejudice resulted.

■ Nineteen of the thirty-four months between Cecil's indictment and his trial were caused by the stay issued by this Court during the pendency of McMillen's interlocutory appeal. Generally, time consumed by an interlocutory appeal, even if taken by the government, is a sufficient reason justifying delay. *United States v. Loud Hawk*, 474 U.S. 302, 315–16, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986).

This issue usually involves an assessment of the purpose and reasonableness of the government's appeal. *Id.; Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 23 (1998), *cert. denied*, 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999). Here, however, the appeal was filed and the stay obtained not by the Commonwealth, but by a codefendant. Although the Commonwealth could have tried Cecil separately from McMillen, which it ultimately was required to do, we do not fault the Commonwealth for attempting to resolve the charges against these four conspirators in one trial. The case was set for trial within a reasonable time after the stay was lifted. The record does not show and Cecil does not claim that he objected to the continuance granted on October 27, 1997. If a defendant acquiesces in a delay, he cannot be heard to complain about the delay. *Wells v. Commonwealth*, Ky., 892 S.W.2d 299, 303 (1995); *Preston v. Commonwealth*, *supra*, at 506.

Finally, although Cecil may have been prejudiced by the mere fact that he was incarcerated during the delay, *Barker v. Wingo*, *supra*, 407 U.S. at 532–33, 92 S.Ct. at 2192–93, he has not identified any prejudice with respect to his ability to present his defense at trial. *Tamme v. Commonwealth*, *supra*, at 23. We conclude that the delay in bringing this case to trial does not justify "the unsatisfactorily severe remedy of dismissal." *Barker*, 407 U.S. at 522, 92 S.Ct. at 2188.

### B. Severance.

■ The trial judge did not err in overruling Cecil's motion for a separate trial. RCr 9.16. Joinder under RCr 6.20 is appropriate where, as here, the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *Jackson v. Commonwealth*, Ky., 670 S.W.2d 828, 834 (1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 784 (1985); *see also Dishman v. Commonwealth*, Ky., 906

S.W.2d 335, 340 (1995). Even if the defendants attempt to cast blame on each other, severance is not required. *United States v. Arthur,* 949 F.2d 211, 217–18 (6th Cir. 1991).

> [N]either antagonistic defenses nor the fact that the evidence for or against one defendant incriminates the other amounts, by itself, to unfair prejudice.... That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than against a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.

*Ware v. Commonwealth,* Ky., 537 S.W.2d 174, 177 (1976).

 The Commonwealth's theory of the case was that Gabow hired Cecil and McMillen to kill her husband and that Cecil aided and abetted McMillen in carrying out the murder. Obviously, evidence that Gabow hired McMillen and Cecil to kill her husband would have been admissible in a separate trial of Cecil to prove his motive for participating in the murder. *Id.*

 A trial judge has broad discretion in determining whether to grant separate trials and his/her decision in that regard will not be overturned absent a showing of prejudice to the defendant and a clear abuse of discretion by the judge. *Humphrey v. Commonwealth,* Ky., 836 S.W.2d 865 (1992); *Turpin v. Commonwealth,* Ky., 780 S.W.2d 619 (1989), *cert. denied,* 494 U.S. 1058, 110 S.Ct. 1530, 108 L.Ed.2d 769 (1990). Neither occurred in this case.

*C. Admission of confessions of McMillen and Gabow.*

 Cecil asserts that the admission of the redacted confessions of McMillen and Gabow violated his right of confrontation guaranteed by the Sixth Amendment of the United States Constitution and Section 11 of the Constitution of Kentucky. Spe-

cifically, he claims that the introduction of the confession of a nontestifying codefendant that inculpates the nonconfessing defendant violates the holding in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, the *Bruton* rule is not violated where, as here, the nontestifying codefendant's confession is redacted so as to delete not only the name of the nonconfessing defendant, but any reference even to his or her existence. *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998); *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Similarly, we held in *Cosby v. Commonwealth,* Ky., 776 S.W.2d 367 (1989), *cert. denied,* 493 U.S. 1063, 110 S.Ct. 880 (1990), *overruled on other grounds, St. Clair v. Roark,* Ky., 10 S.W.3d 482 (1999) that a properly redacted statement is one which "does not provide details that point unerringly to the nonconfessing defendant." *Id.* at 370; *compare Rogers v. Commonwealth,* Ky., 992 S.W.2d 183 (1999), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 366 (1999).

 Cecil argues that even though the confessions of both McMillen and Gabow were redacted so as to delete any reference to his existence, Brangers's testimony effectively reinserted his identity as a co-conspirator into those confessions. In other words, although neither McMillen's nor Gabow's redacted confession made any mention of Cecil's involvement in the conspiracy and murder, Brangers's testimony inculpated Cecil in both the conspiracy and the murder described in those confessions. The problem with this argument is that Brangers did testify at trial and was available for cross-examination. In *Richardson v. Marsh, supra,* a distinction was drawn between a nontestifying codefendant's confession which, as in *Bruton,* expressly implicates the nonconfessing defendant as an accomplice, and a confession, as here, which is not facially incriminating, but which becomes incriminating when linked with evidence introduced elsewhere at trial. Rejecting the theory of "contex-

tual implication," the Court held in *Richardson* that if the nontestifying codefendant's confession is redacted so as to delete any reference to the existence of the nonconfessing defendant, *Bruton* is not violated merely because that defendant is linked to the confession by other admissible evidence. *Richardson*, 481 U.S. at 208–09, 107 S.Ct. at 1707–08. As suggested in *Richardson*, to hold otherwise would virtually eliminate joint trials. *Id.*, 481 U.S. at 209–10, 107 S.Ct. at 1708–09.

Of course, Cecil was not prejudiced by the admission of Gabow's unredacted confession, because that did not occur until after Cecil's case was concluded.

*D. Lesser included offense.*

■■■■■ Cecil asserts error in the trial judge's refusal to instruct the jury on criminal facilitation of murder as a lesser included offense of complicity to murder. As we said in addressing an identical argument in *Houston v. Commonwealth*, Ky., 975 S.W.2d 925 (1998):

> Although a trial judge has a duty to prepare and give instructions on the whole law of the case, including any lesser included offenses which are supported by the evidence, ... that duty does not require an instruction on a theory with no evidentiary foundation.... An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.

*Id.* at 929 (citations omitted).

■■■ Criminal facilitation occurs when a defendant, with no intent to promote or commit the crime himself, provides the means or opportunity for another to do so. KRS 506.080; *Commonwealth v. Day*, Ky., 983 S.W.2d 505, 509 (1999). Cecil did not testify at trial. In his redacted confession, he admitted that he and McMillen discussed killing Frederick Gabow because

they needed the money, that he (Cecil) obtained the murder weapon with the intent that it would be used to kill Gabow, and that he drove McMillen to Gabow's residence with the intent that McMillen would kill Gabow.

> We then drove back to E'town [after obtaining the murder weapon]. While driving back Sam took the gun and began pointing it saying that Son of a Bitch was dead, and then we would get the money. I asked him who was going to do the shooting, and he said that I was going to do it. I told him that I never had shot anyone and I ___, and that I wasn't going to shoot him. He said he would do it. On 2/16/95 [actually, 2/17/95] around 1730 or 1800 hours this date I drove Sam to the trailer park *so we could do the job.* Once we arrived Sam wanted to go to the door and just shoot him. I told him that if he was going to do it, then just do it.... I drove around for awhile while Sam kept saying trust me. Give me the gun. He wanted to get it over with *so we could get the money.* He said that he would walk up to the door and shoot him. I slowed down to about 5 miles an hour and Sam jumped out. He stepped out of my truck with a gun in his hand. A 22 caliber weapon, and walked toward the trailer park. (Emphasis added.)

■■■ As recounted *supra*, Brangers testified that Cecil was involved in the murder-for-hire scheme from the beginning; and that during his conversation with Cheryl Gabow on the day of the murder, Cecil asserted that Frederick Gabow would be killed even if he (Cecil) had to stab him with a knife. No evidence was introduced from which a jury could believe that Cecil obtained the murder weapon and furnished it to McMillen and drove McMillen to the crime scene, but did not intend for McMillen to kill Frederick Gabow; thus, there was no evidentiary basis for an instruction on criminal facilitation.

*E. Separation of jurors and ex parte communication.*

During the jury's deliberations of Cecil's guilt or innocence, Cecil's mother observed several jurors leave the jury room and go to another room. She then saw the trial judge go to the jury room and speak to someone at the door. Cecil asserts that the separation of the jurors violated RCr 9.66 (sequestration of the jury) and that the judge's *ex parte* communication, presumably with one or more of the remaining jurors, violated RCr 8.28(1) (defendant's right to be present at every critical stage of trial). A post-trial evidentiary hearing revealed that the trial judge had authorized recesses in deliberations whenever jurors who were addicted to nicotine needed to leave the jury room to smoke a cigarette, but only if those jurors were accompanied by a bailiff and the non-smoking jurors remained in the charge of another bailiff. Two deputy sheriffs, Ron Wilson and Rick Stickel, were acting as bailiffs at the time. Stickel testified that the jurors knocked on the door and asked for a "smoke break," whereupon he accompanied the smokers to the smoking area to assure that they had no contact with any outsiders. Wilson remained with the other jurors until the smokers returned. Meanwhile, one of Cecil's attorneys notified the trial judge that some of the jurors had left the jury room. The trial judge proceeded to the jury room, ascertained what had occurred, and determined that there had been no violation of the procedures that he had previously authorized.

Criminal Rule 9.66 provides that jurors deliberating a felony charge "shall be sequestered unless otherwise agreed by the parties with approval of the court." That does not mean that each juror must remain constantly in the presence of the others. If that were so, jurors would not be permitted to take restroom breaks or to sleep in separate rooms during an overnight sequestration. The general rule is that a mere temporary separation of the jury is not grounds for reversal if it appears that no definite prejudice resulted and there was no opportunity to tamper with the jurors. 75B Am.Jur.2d *Trial* § 1505 (1992). That has long been the rule in Kentucky.

> There is more or less separation in the case of every jury required to be kept together under the law, it being a well known fact that it is a matter of practical impossibility to keep all twelve members of a jury in close contact with each other at all times.... [T]he trend of rulings has been towards a liberal application and a construction that a substantial compliance with the statute was sufficient unless there was some fact or circumstance indicating that a juror had been approached or an opportunity afforded to influence him.

*Lawson v. Commonwealth*, 278 Ky. 1, 127 S.W.2d 876, 877 (1939) (citations omitted). *See also Smith v. Commonwealth*, Ky., 366 S.W.2d 902 (1962) and *Anderson v. Commonwealth*, Ky., 353 S.W.2d 381 (1962), *cert. denied*, 369 U.S. 829, 82 S.Ct. 847, 7 L.Ed.2d 795 (1962) (jurors properly permitted to separate by being allowed to make telephone calls to relatives concerning their personal needs during overnight sequestration); *Hendrickson v. Commonwealth*, Ky., 259 S.W.2d 1 (1953) (jurors properly permitted to stay in separate hotel rooms during overnight recess); *Marcum v. Commonwealth*, Ky., 256 S.W.2d 22 (1953) (absent a showing or claim of misconduct, temporary absence of two jurors following restroom break did not constitute improper separation).

Furthermore, one of Cecil's attorneys was present in the courtroom when the separation occurred, and he neither objected nor moved for a mistrial. The issue was raised for the first time in Cecil's motion for a new trial; thus, any impropriety with respect to the custody of the jury was waived. *Burkhart v. Commonwealth*, 312 Ky. 555, 228 S.W.2d 451, 453–54 (1950); *Davenport v. Commonwealth*, 285 Ky. 628, 148 S.W.2d 1054 (1941).

As for the alleged *ex parte* communication between the judge and the nonsmoking jurors, we find this brief inquiry

prompted by the concerns of Cecil's counsel to have been harmless. "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 455–56, 78 L.Ed.2d 267 (1983). In *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the test with respect to whether an *ex parte* communication violated the defendant's right to be present at all critical stages of his prosecution was stated to be whether the presence of counsel was necessary to insure fundamental fairness or whether the defendant was deprived of a "reasonably substantial ... opportunity to defend against the charge." *Id.* at 526, 105 S.Ct. at 1484. Here, the communication between the trial judge and the jury was completely unrelated to the subject matter of the case. Instead, the interaction amounted to a "short interlude in a complex trial; the conference was not the sort of event which every defendant had a right personally to attend under the Fifth Amendment. [Cecil] could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending." *Id.* at 527, 105 S.Ct. at 1484–85. This isolated incident neither deprived Cecil of his Constitutional right to due process of law nor violated RCr 8.28(1). *Rushen v. Spain, supra; cf. Kentucky v. Stincer*, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987).

### III. GABOW'S APPEAL.

Gabow asserts three errors on appeal: (A) improper allocation of peremptory strikes; (B) failure to suppress her own confession; and (C) admission at trial of the confessions of Cecil and McMillen.

#### A. Peremptory strikes.

In a criminal case where only twelve jurors are to be seated, the prosecution and the defense are each entitled to eight peremptory strikes. If two or more defendants are tried jointly, they must share the eight basic peremptories, but each defendant is also entitled to one additional peremptory to be exercised separately. If alternate jurors are seated, each side is entitled to nine peremptory strikes; and, if two or more defendants are tried jointly, they must share those nine, but each defendant is also entitled to two additional peremptories to be exercised separately. RCr 9.40; *Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999). In this case, Cecil and Gabow were tried jointly and two alternate jurors were seated. Thus, they were entitled to nine shared peremptory strikes and each was entitled to two additional peremptory strikes to be exercised separately, for a total of thirteen. Instead, they were allotted nine to be shared and one each to be exercised separately, for a total of eleven.

■■■■ The issue was discussed on two separate occasions, first at a pre-trial conference held on October 20, 1997 and again at a hearing held on February 3, 1998. At each of those hearings, the trial judge advised the defendants that he interpreted RCr 9.40 to entitle each defendant to only one additional peremptory strike to be exercised separately.[8] During neither of those hearings did Gabow or any of the other defendants object to this interpretation of RCr 9.40 or offer a contrary interpretation. The defendants argued only that a trial judge has the inherent discretion in a death penalty case to grant defendants more peremptory strikes than are required by the rule.[9]

---

**8.** The case was tried prior to the rendition of *Springer v. Commonwealth, supra.*

**9.** Prior to September 15, 1990, RCr 9.40(3) provided that if more than one defendant is being tried, "the court may at its discretion allow additional peremptory challenges to

each defendant." Even after the deletion of that provision, our cases have continued to suggest in *dicta* that a trial judge retains the discretion to grant additional peremptory strikes to a criminal defendant. *Tamme v. Commonwealth, supra,* at 26; *Bowling v.*

 In *Kentucky Farm Bureau Mutual Insurance Co. v. Cook,* Ky., 590 S.W.2d 875 (1979), we held that an improper allocation of peremptory strikes is reversible error *"if the issue is properly preserved by the adversely affected litigant." Id.* at 877 (emphasis added). *Cf. Howard v. Commonwealth,* Ky.App., 608 S.W.2d 62, 63 (1980) (adversely affected party must object to improper jury selection procedures in order to preserve the issue for appellate review). Where a party specifies his grounds for an objection at trial, he cannot present a new theory of error on appeal. *Ruppee v. Commonwealth,* Ky., 821 S.W.2d 484 (1991). To borrow Justice Lukowsky's oft-quoted acerbity, "appellants will not be permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth,* Ky., 544 S.W.2d 219, 222 (1976). Gabow's present claim that RCr 9.40 *required* the allotment to her of one additional peremptory strike to be exercised separately was not preserved for appellate review. Furthermore, we find no abuse of discretion in the trial judge's refusal to grant the defendants' motions for six additional peremptory strikes.

*B. Voluntariness of Gabow's confession.*

 At the request of Detective Ponder of the Radcliff Police Department, Gabow, accompanied by Brangers and her children, voluntarily came to the police station, where she was interviewed first by Ponder, then by Detective Hornback, to whom, after being given the *Miranda* warnings, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), she confessed her involvement in the murder of her husband. Gabow moved to suppress her confession on grounds that it was involuntarily obtained. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Specifically, she claimed that Ponder overbore her will by promising her that nothing would happen to her if she confessed, but that she would lose custody of her children if she did not. Following a suppression hearing, the trial judge entered written findings rejecting Gabow's version of these events and accepting Detective Ponder's version that he did not promise Gabow leniency in exchange for her confession, but only told her that he believed she was involved in the murder of her husband and that "it was a shame that her children had lost their father and now would lose their mother." The trial judge found that Gabow "may have told her story in hopes of leniency, but there was no promise of leniency or a proposal for a deal; certainly no promise not to prosecute." These findings are supported by substantial evidence, and thus are conclusive. RCr 9.78; *Springer v. Commonwealth, supra,* at 446; *cf. Talbott v. Commonwealth,* Ky., 968 S.W.2d 76, 82 (1998). The Fifth Amendment privilege is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad,* 470 U.S. 298, 304–05, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985). The trial court did not err in refusing to suppress Gabow's confession. *Henson v. Commonwealth,* Ky., 20 S.W.3d 466, 468–70 (2000).

*C. Admission of confessions of McMillen and Cecil.*

As noted *supra,* the confessions of McMillen and Cecil which were introduced during the Commonwealth's case-in-chief [10] had been redacted to delete any reference to even the existence of Cheryl Gabow. Thus, there was no error associated with the admission of either of those redacted confessions. *Gray v. Maryland, supra;*

*Commonwealth,* Ky., 942 S.W.2d 293, 308 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997); *Perdue v. Commonwealth,* Ky., 916 S.W.2d 148, 162 (1995), *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

10. See note 1, *supra,* for a discussion of the evidentiary bases for the introduction of those confessions.

*Richardson v. Marsh, supra; Cosby v. Commonwealth, supra.*

Gabow's primary claim of error is the admission of Cecil's unredacted confession, which inculpated her, during the penalty phase of Cecil's trial, which was tried before the same jury which subsequently considered the guilt or innocence of Gabow. Remember, the only reason the admission of Cecil's unredacted confession occurred before the completion of the guilt phase of Gabow's trial was that Gabow intended to and did introduce her own unredacted confession, which inculpated Cecil. Thus, if the respective confessions were entirely consistent, the introduction of Cecil's unredacted confession would be subject to harmless error analysis. *Gill v. Commonwealth*, Ky., 7 S.W.3d 365, 368–69 (1999). However, though the confessions are consistent with respect to the circumstances and motives surrounding the murder-for-hire agreement, they are arguably inconsistent on the issue of Gabow's claim of renunciation.

Gabow was the first to confess and claimed in her confession that both she and Cecil had renounced any further interest in the plot to kill her husband. Cecil subsequently gave a written confession to Detective Hornback, who then read the statement aloud in a videotaped interview with Cecil, permitting Cecil to make any desired corrections or explanations. The videotaped interview, which was played to the jury, included the following:

> *Hornback* (reading): Okay, on February 17th we woke up and Sam began drinking vodka.
> *Cecil:* Correct.
> *Hornback* (reading): I drove to Cheryl's house and spoke with her about Sam. She then brought up the fact that Fred went to work at 10:00 p.m. and that we needed to be there by 9:30 p.m. to do the job.
> *Cecil:* Correct.
> *Hornback* (reading): Cheryl then said that it needed to be done before Monday

because she was going to sign the divorce papers on Monday or Tuesday.
> *Cecil:* Correct.
> *Hornback* (reading): I told her that it would be done before Monday because Sam wanted it done. He said he was tired of waiting around and he wanted the money.
> *Cecil:* Correct.

Cecil's confession does not mention Gabow's claimed renunciation. Gabow's confession does not mention the above colloquy recounted by Cecil. Thus, neither confession directly contradicts the other, though each omits a critical fact contained in the other. Compare *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), a double murder case in which the confession of the nontestifying codefendant directly contradicted the defendant's claim that she was not involved at all in the death of one victim and that she killed the other victim in self-defense. Here, Gabow claims that Cecil's confession "devastated" her renunciation defense, not because it directly contradicted her claim of renunciation (it did not), but because the jury could have *inferred* from Cecil's confession either that Gabow's renunciation never occurred or, if it did, that she changed her mind and rejoined the conspiracy before its objective was consummated. Thus, Gabow asserts that the admission of Cecil's confession before the determination of her guilt or innocence could not have been harmless error. We agree that Cecil's confession was not harmless, but do not agree that its admission was error. The issue is not whether Cecil's confession prejudiced Gabow, but whether it was reliable.

▮ *Bruton v. United States, supra,* holds that a confession by a codefendant which inculpates a nonconfessing defendant is inadmissible in a joint trial unless the confessing codefendant elects to testify and is therefore available for cross-examination with respect to the confession. The *Bruton* rule is not violated if, as during the Commonwealth's case-in-chief, the nontes-

tifying defendant's confession is so redacted as to delete any reference to the existence of the nonconfessing codefendant. *Gray v. Maryland, supra; Richardson v. Marsh, supra.* However, the decisions of the United States Supreme Court are less clear in a factual context in which each codefendant has confessed and inculpated the other and both unredacted confessions are admitted into evidence at a joint trial. In *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), a plurality of the Court held that *Bruton* does not apply where codefendants have given "interlocking" confessions. *Bruton* was premised upon the assumption that the introduction of the confession of a nontestifying codefendant which inculpates the defendant is so devastating to the defendant that a mere curative admonition will not overcome the prejudicial effect of the violation of the defendant's right of confrontation. The *Parker* plurality held that where the confessions of both defendants are admitted, the defendant is already so devastated by his own confession that the introduction of the nontestifying codefendant's interlocking confession could not be any more devastating to him. *Parker v. Randolph, supra,* 442 U.S. at 72–73, 99 S.Ct. at 2139. Other courts began treating the "interlocking confessions" rationale as an exception to the *Bruton* rule. *Cf. State v. Bleyl,* 435 A.2d 1349 (Me.1981).

In *Lee v. Illinois, supra,* the Supreme Court modified the "interlocking confessions" rationale of *Parker v. Randolph, supra,* holding that "interlocking" means that those portions of a codefendant's statement which bear to any significant degree on the defendant's participation in the crime are inadmissable unless "thoroughly substantiated" by the defendant's own confession. *Lee,* 476 U.S. at 545, 106 S.Ct. at 2064. And in *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Court abandoned the "already devastated" rationale of *Parker v. Randolph,* holding that the "interlocking" nature of the confessions does not relate to

the *harmfulness* of the codefendant's confession, but to its *reliability.*

> If it confirms essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability ... may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted as evidence against the defendant* ....

*Id.* at 192–93, 107 S.Ct. at 1719 (emphasis in original).

In *Lee v. Illinois, supra,* the Court reiterated its long-held conclusion that the confession of an accomplice that implicates the defendant is presumptively unreliable, 476 U.S. at 541, 106 S.Ct. at 2062, citing *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); and that the presumption can be overcome only by sufficient independent "indicia of reliability." *Lee,* 476 U.S. at 539, 106 S.Ct. at 2061, citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). *Ohio v. Roberts* holds that such reliability can be inferred without more where the evidence falls within a "firmly rooted" exception to the hearsay rule. In other cases, the evidence must be excluded, "at least absent a showing of particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S.Ct. at 2539 (emphasis added).

Thus, there currently are three recognized exceptions to the *Bruton* rule. A confession of a nontestifying defendant is inadmissible at the trial of a codefendant unless (1) the confession has been sufficiently redacted in accordance with *Gray v. Maryland* and *Richardson v. Marsh* to delete not only the name but any reference to the existence of the codefendant; or (2) the confession falls within a "firmly rooted" exception to the hearsay rule; or (3) the confession possesses "particularized guarantees of trustworthiness." The phrase "particularized guarantees of trustworthiness" means a totality of circumstances rendering the statement at least as reliable as a "firmly rooted" exception to

the hearsay rule. *Idaho v. Wright,* 497 U.S. 805, 820–21, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). Presumably, this means that even though a particular guarantee of trustworthiness might be an insufficient indicia of reliability, an unspecified number of such guarantees, taken together, can constitute a totality of circumstances which would be just as reliable as a "firmly rooted" exception to the hearsay rule.

The first exception to *Bruton* has no application here, because the version of Cecil's confession which was introduced during the penalty phase of his trial was unredacted. As for the second exception to *Bruton,* the only hearsay exception which might apply to Cecil's confession is KRE 804(b)(3), the exception for declarations against penal interest.[11] The United States Supreme Court has yet to render a majority opinion specifically holding whether that exception is or is not "firmly rooted." The lead opinion in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) is a plurality opinion and the concurring opinions of Justices Breyer, Scalia and Thomas do not specify their positions on this issue. Nor do any of the opinions in *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) specifically address this issue. Although a footnote in *Lee v. Illinois, supra,* at 544 n. 5, 106 S.Ct. at 2064 n. 5 states that the concept of declaration against penal interest "defines too large a class for meaningful Confrontation Clause analysis," Justice O'Connor's lead opinion in *Williamson,* 512 at 605, 114 S.Ct. at 2437, states that "we need not decide whether the hearsay exception for declara-

tions against interest is 'firmly rooted,'" indicating that the issue is still "alive." However, we need not engage in speculation as to how a majority of the Supreme Court might ultimately decide this issue; for Cecil's account of his February 17, 1995 conversation with Cheryl Gabow falls under the third exception to *Bruton* in that it has "particularized guarantees of trustworthiness." This, of course, is a fact-intensive inquiry. *Lilly,* 527 U.S. at 136, 119 S.Ct. at 1900.

■ The mere fact that a statement is self-inculpatory, *i.e.,* a declaration against penal interest, is, itself, a particularized guarantee of trustworthiness. *Williamson,* 512 at 605, 114 S.Ct. at 2437. The issue in this respect is whether the statement is truly self-inculpatory or whether it is, in fact, self-exculpatory in that it shifts the blame from the confessor to his codefendant.[12] *Id.* at 604, 114 S.Ct. at 2437. In *Williamson,* the confessing defendant "admitted involvement, but did so in a way that minimized his own role and shifted blame to [his codefendant]." *Id.* at 608, 114 S.Ct. at 2439 (Ginsburg, J., concurring). Here, Cecil's account of his February 17th discussion with Cheryl Gabow was not self-exculpatory in that it neither minimized his role in the killing nor shifted the blame to Gabow. The very subject of the conversation inculpated Cecil in the plot to kill Frederick Gabow. Cheryl Gabow would have had no reason to tell Cecil when the murder needed to take place unless Cecil was also involved in the plot. "Even statements that are on their face neutral may actually be against the declarant's interest." *Id.* at 603, 114 S.Ct. at 2436–37. But this conversation

---

11. The Commonwealth posits that Cecil's confession is admissible as a statement by a coconspirator, KRE 801A(b)(5). However, the confession was made after the objective of the conspiracy was accomplished, thus was not made "in furtherance of the conspiracy" as the rule requires. *Napier v. Commonwealth,* Ky., 515 S.W.2d 615 (1974); Lawson, *supra* note 1, § 8.30 II, at 404. Nor is it admissible as an "admission" under KRE 801A(b)(1), because admissions are admissi-

ble only against the declarant (Cecil). Of course, Cecil's unredacted confession was introduced *by* Cecil, not *against* him. *See* notes 1 and 2, *supra.*

12. Each statement within the broader narrative must be examined individually to determine whether it is, in fact, self-inculpatory. *Cf. Williamson,* 512 U.S. at 600–01, 114 S.Ct. at 2435.

was not even facially neutral. According to Cecil, when Gabow told him that the killing needed to take place before Monday, he assured her that "it would be done before Monday." If Cecil's motivation had been to minimize his involvement and shift the blame to Gabow, he presumably would not have repeated his own assurance to Gabow that the murder would be accomplished on schedule.

In *Lilly v. Virginia, supra*, it was emphasized that the confession was in response to a police officer's leading questions, that the confessor had a natural motive to exculpate himself, and that the confessor was under the influence of alcohol during the interrogation. *Id.* at 139, 119 S.Ct. at 1901. Here, Cecil's written statement, which was in narrative form, does not appear to have been in response to leading questions; and the videotape shows that his demeanor was calm and that he did not appear to be under the influence of alcohol or drugs. He may have had a motive to exculpate himself, but, as noted *supra*, his statement was not self-exculpatory.

*Cruz v. New York, supra*, holds that "the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient 'indicia of reliability' to be directly admissible against him." 481 U.S. at 193–94, 107 S.Ct. at 1719. In other words, although the interlocking nature of the defendants' respective confessions is not determinative of admissibility, it is a factor to be considered in determining whether the codefendant's confession has sufficient indicia of reliability to be admissible, *i.e.*, it is another "particularized guarantee[ ] of trustworthiness." Gabow's own confession confirmed every significant aspect of Cecil's confession except the February 17th conversation—and she did not specifically deny Cecil's version of that conversation.[13]

Yet another factor giving Cecil's account of the February 17th conversation a particularized guarantee of trustworthiness is that his statement contains information, *i.e.*, the time Frederick Gabow went to work and the date Cheryl Gabow was going to sign the divorce papers, which presumably would have been unknown to Cecil unless furnished to him by Gabow. There is no indication that Cecil knew at the time of his confession that Gabow had claimed to have renounced her role in the conspiracy. If he had known of Gabow's claimed renunciation, Cecil would have had a greater motive to adopt Gabow's version of the conversation than to contradict it; for Gabow's version was that she and Cecil had *both* renounced any further interest in carrying out the murder. Finally, if Cecil's intent had been to contradict Gabow's version, he presumably would have done so directly and not merely by inference.[14]

To summarize, the "particularized guarantees of trustworthiness" which made Cecil's statement admissible against Gabow were (1) the statement was self-inculpatory and did not shift blame from Cecil to Gabow; (2) Gabow's own confession confirmed Cecil's confession in all significant respects except with respect to their February 17th conversation, and did not directly contradict Cecil's version of that

---

**13.** Although *Idaho v. Wright, supra*, holds that corroboration is not a factor in considering the reliability of an out-of-court statement, 497 U.S. at 822–24, 110 S.Ct. at 3150–51, that case did not involve confessions of codefendants and did not purport to overrule *Cruz v. New York*. In fact, the discussion in *Wright* appears to pertain to corroborating physical evidence as opposed to the defendant's own confession. *Id.* at 824, 110 S.Ct. at 3151.

**14.** Though corroboration is not a factor to be considered in assessing the reliability of an out-of-court statement, *see* note 13, *supra*, we recognize the inherent probability that Cecil's version of the February 17th conversation, rather than Gabow's version, was true; for later that same day, Cecil did, in fact, participate in the murder of Frederick Gabow. Why would someone who had been hired to murder a perfect stranger commit that murder after being advised by the person who had hired, but not yet paid, him that she had changed her mind and no longer wanted the murder to occur?

conversation; (3) Cecil's confession attributes statements to Gabow containing information not peculiarly within Cecil's knowledge but peculiarly within Gabow's knowledge; (4) there is no indication that Cecil knew at the time of his confession that Gabow had claimed to have renounced her role in the conspiracy; (5) Gabow's claimed renunciation exculpated Cecil as well as herself, so that Cecil had no motive to contradict her claim; and (6) if Cecil had intended to "devastate" Gabow's renunciation defense, he could have done so directly instead of only inferentially.

Accordingly, the judgments of conviction and sentences imposed by the Hardin Circuit Court in both of these cases are affirmed.

LAMBERT, C.J., GRAVES, JOHNSTONE, KELLER and WINTERSHEIMER, JJ., concur.

STUMBO, J., concurs in result only without separate opinion.